55 Ill.2d 198 (1973)
302 N.E.2d 330
NATIONAL CASTINGS DIVISION OF MIDLAND-ROSS CORPORATION, Appellant,
v.
THE INDUSTRIAL COMMISSION et al.  (Lon Conley, Appellee.)
No. 45240.
Supreme Court of Illinois.
Opinion filed October 1, 1973.
ROBERT H. JOYCE and SEYFARTH, SHAW, FAIR-WEATHER & GERALDSON, both of Chicago, for appellant.
E. ANNE MAZUR, of Chicago (SIDNEY Z. KARASIK, of counsel), for appellee.
Judgment affirmed.
MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:
Lon Conley, claimant herein, filed an application for *199 adjustment of claim before the Industrial Commission seeking compensation for total loss of vision of his left eye which he alleged was causally related to an accident which occurred on January 2, 1968, while he was working for National Castings Division of the Midland-Ross Corporation (hereinafter National). The arbitrator denied recovery because claimant failed to prove that he sustained any disability as a result of the accidental injury and the Commission confirmed. On certiorari, the circuit court of Cook County determined that the record supported a finding that the accident "precipitated and accelerated a latent condition" resulting in the loss of vision in claimant's left eye. It therefore set aside the Commission's decision and remanded to enter an award. This was done and the circuit court thereafter affirmed. National appeals from this judgment. The sole issue presented for review is whether the circuit court's determination that claimant's condition was causally related to his employment was proper.
Claimant, who was 39 years old at the time of the accident, testified before the arbitrator that he had worked for National since 1965 when he received a complete medical examination apparently resulting in no unfavorable findings. His duties consisted of loading moldings onto a conveyor belt. These moldings had been covered with a chemically treated sand. On the day of the accident a molding broke, scattering sand, some of which entered claimant's left eye despite his use of safety glasses. He immediately noticed a burning sensation and tried to remove the sand. After informing his foreman of the incident, he was instructed to seek first aid. There his eye was swabbed and he returned to work after being given a dark lens to place over his glasses. When claimant finished work that day, his eye was still burning and had begun to swell. That night he visited a doctor but received no treatment. The following day he was still able to see but was suffering from a headache. He returned to the *200 physician and was directed to the Illinois Eye Clinic, where he was examined and given medication for eye inflammation. Until January 5, 1968, claimant was able to distinguish three fingers on his physician's hand but on the next day the sight in his left eye was completely gone and did not return. The following month he was referred to Illinois Research Hospital Eye Clinic where he was treated as an out-patient for several months before being hospitalized for about one week. At this time he experienced some numbness in his hand and leg which later disappeared. He disclaimed any problem with his eyesight prior to the incident at work. Claimant's hospital records were introduced into evidence which indicated that he suffered from multiple sclerosis.
Dr. Carl Apple, a privately practicing opthalmologist and medical school teacher, was called by claimant before the arbitrator. For over forty years this physician specialized in eye diseases. He had examined claimant six months after the accident and found normal vision in claimant's right eye but no light perception in the left eye, which had an atrophy of the optic nerve. Dr. Apple was of the opinion that the blindness in the left eye was permanent. In response to a hypothetical question encompassing all the facts in evidence this physician said that there was a causal connection between the condition of the left eye and the accident.
He explained that while the causes of multiple sclerosis are unknown the disease affects various nerves which eventually result in paralysis and blindness. During the course of the disease the resulting conditions undergo stages of remission and exacerbation, i.e., they disappear but often recur. A patient suffers a loss of vision which returns periodically only to ultimately diminish as the optic nerve atrophies. Any trauma could precipitate the disease or activate a dormant condition, but in either case the remission and exacerbation process would be the same. On cross-examination Dr. Apple admitted that because the *201 cause of this disease is unknown some other event might have activated the disease and there was the possibility that an optic nerve could atrophy without a traumatic event if a person had multiple sclerosis.
National called Dr. Samuel Shapiro, who specializes in opthalmology and otolaryngology (ear, nose and throat). He is familiar with multiple sclerosis and described it as a disease of the myelin sheath of the nerve fibers in the central nervous system. This disease, whose cause is unknown, primarily attacks the brain, spinal cord and optic nerve. He testified that claimant suffered from retrobulbar neuritis which causes inflammation of the optic nerve. This results in complete loss of central vision with a possible diminution of side vision. Retrobulbar neuritis may ensue from several factors including multiple sclerosis, but when symptoms of the multiple sclerosis are present this is probably the cause of retrobulbar neuritis.
Dr. Shapiro examined claimant about ten months after the accident. In response to a hypothetical question he said that claimant's loss of vision could not be related to sand coming in contact with the eye surface. He based his opinion upon claimant's diagnosed condition of retrobulbar neuritis, which progresses outward from the interior of the eye and would not be affected by particles which, as here, do not reach the eye's interior. He agreed that a traumatic event might aggravate a multiple sclerotic condition but the degree of trauma would have to approximate a blow to the spinal cord or head and could not occur from emotional stress such as that developed by an individual with a foreign particle in his eye.
Several documents were introduced into evidence which contained observations as to claimant's condition shortly after the incident in question. A consulting neurologist noted evidence of eye trauma several weeks after claimant's accident. Another neurologist found that it was unusual that retrobulbar neuritis failed to improve if multiple sclerosis was its etiology. On a health insurance *202 form an attending physician negatively responded to a question as to whether claimant's condition was work-related.
On review before the Commission, National called Dr. Eric Oldberg, head of the department of neurology and neurosurgery at a medical school, who corroborated the fact that the cause of multiple sclerosis was unknown. He testified there was no causal connection between claimant's condition and the incident at work, explaining that emotional shock and trauma could not aggravate a dormant condition of multiple sclerosis and that trauma was not generally accepted as an etiology of this disease. During cross-examination he admitted that claimant's condition was rare, because it was common for loss of vision to occur for a time and then improve but this did not happen to claimant. In response to a question as to whether the sand could have caused a more rapid blindness, he said there was a remote possibility of this and he could not categorically say that it could not happen though it was very unlikely.
Dr. Sherman Kaplitz, a neurologist, was called by claimant, and in response to a hypothetical question testified there could be a causal connection between claimant's loss of vision and his employment because in his opinion latent multiple sclerosis can be aggravated by slight or severe trauma, which in some situations may actually precipitate symptoms of multiple sclerosis. He said that in a case such as claimant's, eye trauma could be generated by the chemically treated sand which would be related to the severe pain, visual difficulty and culmination in blindness. He distinguished the course of claimant's condition from that caused normally by multiple sclerosis because, in the latter, the visual difficulties would be temporary and then improve.
National argues that the question of causation is one of fact and where the evidence is conflicting and permits *203 contrary inferences to be reasonably drawn, the decision of the Commission cannot be disturbed unless contrary to the manifest weight of the evidence. It is National's position that this case presents such a conflict and the Commission's original decision should not have been overturned for it cannot be said that the determination was violative of this evidentiary standard. Conversely, claimant maintains that all cases of multiple sclerosis are not compensable per se. However, where the only explanation for his blindness, contained in the record, is the incident involving a chemically treated substance coming in contact with his eye, followed by pain, swelling and unusually rapid, permanent loss of vision, then he is properly entitled to compensation.
A claimant must establish that his employment was a causative factor of his condition (Excelsior Leather Washer Co. v. Industrial Com., 54 Ill.2d 318, 326), but he need not negate every other possible cause. (Guardian Electric Manufacturing Co. v. Industrial Com., 53 Ill.2d 530, 534; Material Service Corp. v. Industrial Com., 53 Ill.2d 429, 434.) If disputed questions of fact arise concerning causation, it is primarily the Commission's function to resolve the issue (Bell and Gossett Co. v. Industrial Com., 53 Ill.2d 144, 149), including those situations which involve conflicting medical testimony; and the Commission's decision will not be disturbed unless contrary to the manifest weight of the evidence. Hartwell v. Industrial Com., 51 Ill.2d 562, 565; Kerz v. Industrial Com., 51 Ill.2d 319, 322.
In the present case several facts are uncontroverted. The origin of multiple sclerosis is unknown. Three of the physicians who testified concluded that trauma could accelerate a latent condition of multiple sclerosis though they differ as to the degree of trauma which would be necessary, and Dr. Oldberg, while initially expressing a contrary opinion, later qualified his view by stating that a *204 very remote possibility existed that sand may have caused blindness to occur more rapidly. It is also not disputed that claimant, who had no prior history of difficulty, experienced immediate continuous pain, swelling and rapid deterioration resulting in complete loss of vision in his left eye within several days of the accident. The course of this degeneration was unusual, for it did not follow the standard progression directly attributable to multiple sclerosis or retrobulbar neuritis.
Where, as here, there exists limited medical knowledge of a malady, we have recognized that medical testimony pertaining to causation may not be unqualified and unequivocal. (United States Steel Corp. v. Industrial Com., 32 Ill.2d 68, 74, and cases therein cited.) As the court stated in Plano Foundry Co. v. Industrial Com., 356 Ill. 186, 198-99, "Proof of the state of the health of the employee prior to and down to the time of the injury, and the change immediately following the injury and continuing thereafter, is competent as tending to establish that the impaired condition was due to the injury." We find that the rapid, unexplained, total loss of vision within a short time after the accident convincingly established that the occurrence was a causative factor in claimant's condition. The Commission's contrary decision was therefore against the manifest weight of the evidence and the circuit court properly granted relief. Its judgment is affirmed.
Judgment affirmed.