ERIKA MAY, a Minor, by and through her Mother and Next Friend, Brenda May, *et al.*, Plaintiffs-Appellees, v. CENTRAL ILLINOIS PUBLIC SERVICE COMPANY *et al.*, Defendants (John R. Lumpkin, Director of Public Health, Contemnor-Appellant).

Fifth District    No. 5—93—0316

Opinion filed April 18, 1994.

42

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Mark E. Wilson, Assistant Attorney General, of counsel), for appellant.

Thomas F. Londrigan, of Londrigan, Potter & Randle, P.C., and Michael B. Metnick, of Metnick, Barewin, Wise & Cherry, both of Springfield, for appellee Erika May.

Scott D. Lane, of Lane & Lane, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Saul J. Morse and Robert John Kane, both of Illinois State Medical Society, of Springfield, for *amicus curiae* Illinois State Medical Society.

JUSTICE GOLDENHERSH delivered the opinion of the court:

This is an appeal by contemnor, Dr. John R. Lumpkin, Director of Public Health, from an order of the circuit court of Christian County requiring the Department of Public Health (Department) to release certain documents to plaintiffs in a personal injury action. Contemnor also appeals the trial court's order finding him in contempt for failing to produce those same documents. We affirm.

I

In the underlying action, plaintiffs, Erika May, a minor by and through her mother and next friend, Brenda May, and Brenda May, individually, and Chad Hryhorysak, a minor, by and through his mother and next friend, Pam Hryhorysak, and Pam Hryhorysak, individually, filed a complaint against Central Illinois Public Service Company (CIPS) and Hanson Engineers, Inc., for damages allegedly caused by coal tar left in partially destroyed underground storage tanks at a coal gasification plant in Taylorville. CIPS demolished the plant before 1940, but the coal tar remained in the underground tanks until the 1980's. Coal tar is a known human carcinogen.

In January 1987, CIPS commenced a removal action mandated by the Illinois Environmental Protection Agency, whereby CIPS removed 9,000 cubic yards of contaminated soil and several of the storage tanks. Plaintiffs allege that during the removal action and until April 1989, levels of contaminants which exceeded minimum guidelines for human safety were released into the air.

In 1990, three children from Taylorville were diagnosed with neuroblastoma, a rare childhood cancer which occurs at a frequency

of approximately 9 cases per 1 million live births. In 1988, Christian County, where Taylorville is located, had 520 live births. Plaintiffs allege that the statistical excess of neuroblastoma in Taylorville was caused by contaminants released at the CIPS coal gasification site.

At the request of the families of children diagnosed with neuroblastoma, the Department investigated the incidence of the disease in two specific zip codes, 62568 and 62540, which are assigned to Taylorville and Kincaid. On June 25, 1992, plaintiffs served a subpoena *duces tecum* upon the Department, commanding it to produce any and all documents pertaining to the Department's investigation of the Taylorville CIPS site and the outbreak of neuroblastoma, including the files of the Division of Epidemiology and the Division of Environmental Health. On January 21, 1993, plaintiffs served Dr. Lumpkin with a subpoena demanding production of the same documents the Department was supposed to produce.

On February 2, 1993, contemnor filed for a protective order, asserting that certain documents plaintiffs requested were privileged under the Illinois Health and Hazardous Substances Registry Act (the Registry Act) (410 ILCS 525/1 *et seq.* (West 1992)) and the Medical Studies Act (the Studies Act) (735 ILCS 5/8—2101 (West 1992)). Specifically, contemnor asserted a privilege as to the following documents which the Department did not produce: case histories, incident report forms, pathology reports, patient summaries of nonplaintiff neuroblastoma patients, consent forms, medical records and data of persons not parties to this action, and questionnaires completed pursuant to information provided by plaintiffs and their families.

On February 8, 1993, the trial court held that the Department would be required to produce the Illinois Cancer Registry by listing the type of cancer, the date of diagnosis, and the zip code of each cancer patient. The trial court also ordered the Department to produce the questionnaires administered to plaintiffs and their families. The trial court restricted all counsel from identifying or attempting to identify or contact cancer patients from information produced pursuant to the subpoena.

The Department moved for reconsideration and offered to produce the registry listing by type of cancer and date of diagnosis but include the county of patient residence rather than the patient's zip code. The trial court denied the Department's motion and rejected its claim of privilege under the Studies Act with regard to the questionnaires.

On March 22, 1993, the Department informed plaintiffs' counsel by letter that it "respectfully decline[d] to comply" with the court's

order regarding the production of the cancer registry by type of cancer, date of diagnosis, and zip code and regarding the production of the questionnaires. In response to this letter, plaintiffs filed a petition for rule to show cause. At the hearing on plaintiffs' petition, the Department requested 14 additional days to file an affidavit by its epidemiologist, Dr. Holly Howe, to make a record for the appeal. The trial court questioned the Department's motives and asked if the request was "a further dilatory action" or "a stalling tactic." The trial court also questioned why the Department was trying to build a record for appeal based on information or evidence not presented to the trial court in prior hearings. The court did grant the Department's request for the 14 days, however, and allowed plaintiffs five days to file a response.

On May 12, 1993, the trial court held its final hearing on the matter. The parties agreed that the only unresolved issues related to the Department's refusal to provide the completed questionnaires and the cancer registry. The court found Dr. Lumpkin in indirect civil contempt of court and imposed a $500 fine *instanter* and ordered an additional fine of $100 per day starting May 13, 1993, until an appeal was filed. This appeal was filed the same day.

## II

The first issue we address is whether disclosure of the Illinois Cancer Registry violates the Registry Act. The General Assembly stated in section 2 of the Registry Act, in pertinent part:

"(a) \*\*\*

\* \* \*

(iv) it is the obligation of the State government to inform and protect the citizens of Illinois by developing a comprehensive and integrated data system on hazardous substances and public health." (410 ILCS 525/2(a)(iv) (West 1992).)

The General Assembly stated that one of the purposes of collecting cancer-incidence information pursuant to the Registry Act is to "inform health professionals and citizens about risks, early detection and treatment of cancers known to be elevated in their communities." (410 ILCS 525/2(c)(3) (West 1992).) Section 12 of the Registry Act states, in pertinent part:

"§ 12. All information contained in the Registry \*\*\* shall be made available to the public upon request \*\*\*." 410 ILCS 525/12 (West 1992).

■ Our interpretation of this unequivocal language is that the General Assembly, in creating the Registry Act, intended the public to have access to information regarding hazardous substances and their effect on the public health. The clear mandate of section 12 is

that the public should have access to information contained in the Illinois Cancer Registry.

Despite the clarity of this statutory language, the Department argues that the Registry Act prohibits it from disclosing the Illinois Cancer Registry to plaintiffs in this action. The Department bases its argument on section 4(d) of the Registry Act, which provides, in pertinent part:

> "(d) The identity, or any group of facts which tends to lead to the identity, of any person whose condition or treatment is submitted to the Illinois Health and Hazardous Substances Registry is confidential and shall not be open to public inspection or dissemination." (410 ILCS 525/4(d) (West 1992).)

This provision limits the type of information to which the public will have access, in order to protect the privacy of individual cancer patients. When this provision is considered in the context of the above-mentioned provisions of the Registry Act, it becomes necessary for the Department to disseminate all information contained in the Illinois Cancer Registry which will not violate the privacy of individual cancer patients.

Although the Department concedes that the circuit court's order does not require it to disclose the names of the cancer patients on the registry, it argues that providing a cancer patient's zip code, type of cancer, and date of diagnosis is a disclosure of facts which tends to lead to the identity of the victims. We disagree. It seems highly unlikely that the zip code, type of cancer, and date of diagnosis would be enough information to determine a patient's identity unless the patient made his or her condition public knowledge. If a cancer patient wishes to remain anonymous, this court does not see how dissemination of the person's zip code, type of cancer, and date of diagnosis, without any more specific facts such as age, gender, occupation, etc., tends to lead to the patient's identity. And, if cancer patients publicly disclose enough information about their condition so that they can be identified merely by their zip code, type of cancer, and date of diagnosis, it is not the Department's right or its duty to claim that disclosure of these three facts will violate the privacy of any individuals who wish to remain anonymous. We conclude the trial court properly ordered the Department to disclose the Illinois Cancer Registry by zip code, date of diagnosis, and type of cancer.

### III

■ We next turn to the issue whether the Registry Act prohibits the Department from disclosing the questionnaires administered to plaintiffs and their families. The Department argues that releasing

the questionnaires would severely undermine its ability to perform valid epidemiological studies because the interviewees were all promised that the information on the questionnaires would be confidential. The questionnaires plaintiffs requested are the recorded answers that plaintiffs and their families provided. Each plaintiff and his or her family members who were involved in or referred to in the questionnaires signed consent forms authorizing the Department to release the questionnaires to plaintiffs' counsel. Plaintiffs are not requesting questionnaires of any nonparty cancer patients. Clearly the Department will not be violating the Registry Act by giving plaintiffs copies of their own questionnaires.

In support of its position, the Department cites cases addressing dissemination of medical reports of nonparty patients. Such case law is not relevant to this issue. Plaintiffs in the case at bar merely want copies of what are, in essence, their own medical reports, not the medical reports or questionnaires of third parties. The Department's argument that disclosure of the questionnaires will undermine its ability to assure future patients' confidentiality is unwarranted and groundless.

We next address whether production of the Illinois Cancer Registry and the questionnaires would violate the Studies Act. Section 8—2101 of the Studies Act reads as follows:

"§ 8—2101. Information obtained. All information, interviews, reports, statements, memoranda or other data of the Illinois Department of Public Health, municipal health departments, the Illinois Department of Mental Health and Developmental Disabilities, the Mental Health and Developmental Disabilities Medical Review Board, Illinois State Medical Society, allied medical societies, health maintenance organizations and medical organizations under contract with health maintenance organizations, physician-owned inter-insurance exchanges and their agents, or committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care, shall be privileged, strictly confidential and shall be used only for medical research, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges, except that in any hospital proceeding to decide upon a physician's staff privileges, or in any judicial review thereof, the claim of confidentiality shall not be invoked to deny such physician access to or use of

data upon which such a decision was based." 735 ILCS 5/8—2101 (West 1992).

Our supreme court has repeatedly stated that the purpose of this legislation is "to ensure the effectiveness of professional self-evaluation, by members of the medical profession, in the interest of improving the quality of health care." (*Richter v. Diamond* (1985), 108 Ill. 2d 265, 269, 483 N.E.2d 1256, 1257-58; *Roach v. Springfield Clinic* (1993), 157 Ill. 2d 29, 40, 623 N.E.2d 246, 251; *Jenkins v. Wu* (1984), 102 Ill. 2d 468, 480, 468 N.E.2d 1162, 1168.) The court has also held that the Studies Act is premised on the belief that, absent a statutory peer review privilege, physicians would be reluctant to sit on peer review committees and engage in frank evaluations of their colleagues. *Roach*, 157 Ill. 2d at 40, 623 N.E.2d at 251; *Richter*, 108 Ill. 2d at 269, 483 N.E.2d at 1258; *Jenkins*, 102 Ill. 2d at 480, 468 N.E.2d at 1168.

■ The documents at issue in the present case have absolutely no connection with the types of information covered by the Studies Act. As we have repeatedly stated, the patient questionnaires contain information regarding the medical histories and lifestyles of plaintiffs and their families. The questionnaires have nothing to do with peer review or self-evaluation by members of the medical profession or employees of the Department. We find the Department's assertion that somehow the Studies Act prevents it from disclosing plaintiffs' questionnaires to be completely without merit. To extend the privilege afforded by the Studies Act to documents such as these would dramatically exceed its intended scope. Furthermore, even if we were to find the Studies Act applicable to the questionnaires, we would also find that the questionnaires fall squarely into the category of patient medical records, a clear exception to the information protected by the Studies Act.

We also find that the scope of the Studies Act does not encompass the Illinois Cancer Registry. There is no evidence that the registry was created to improve or advance peer review, self-evaluation, or the quality of patient care, and as we already concluded, the Registry Act clearly mandates that the registry be made available to the public so long as the identities of the patients listed there are not revealed without their consent.

IV

■ The last issue we must consider is whether this court should vacate the trial court's order holding contemnor in indirect, civil contempt for failing to comply with the court's discovery order. It is well established that the courts are vested with an inherent power to punish for contempt, this power being essential to maintain their

authority and to administer and execute judicial power. (*In re G.B.* (1981), 88 Ill. 2d 36, 430 N.E.2d 1096; *Central Production Credit Association v. Kruse* (1987), 156 Ill. App. 3d 526, 509 N.E.2d 136.) The power to punish for contempt rests within the sound discretion of the trial court, and a trial court's determination will not be disturbed on review unless there has been an abuse of discretion. *In re Estate of Maslowe* (1985), 133 Ill. App. 3d 1043, 479 N.E.2d 1180.

In the present case, contemnor repeatedly refused to comply with the trial court's discovery order. At the hearing on the motion to show cause, contemnor requested 14 additional days to allow the filing of an affidavit that the Attorney General already had in his possession. Although the trial court granted contemnor's request for continuance, it later found contemnor's tactics to be "dilatory" and concluded that the only way to avoid further delay was to find Dr. Lumpkin in contempt and impose daily fines until the matter was appealed. We do not think such a conclusion was an abuse of discretion, and we decline to vacate the order finding contempt under these circumstances. Without the power to punish litigants for unreasonably failing to comply with court orders, it would be impossible to enforce such orders. As seen in this case, some orders require vigorous enforcement.

For the foregoing reasons, the order of the circuit court of Christian County is affirmed.

Affirmed.

CHAPMAN and MAAG, JJ., concur.