ZACHARY DONALDSON *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Defendant-Appellant and Cross-Appellee (Hanson Engineers, Inc., *et al.*, Defendants and Cross-Appellees).

Fifth District   No. 5—98—0692

Opinion filed May 10, 2000.

David J. Rosso, Carol A. Ahern, and Junius C. McElveen, Jr., all of Jones, Day, Reavis & Pogue, of Chicago, and Stephen R. Kaufmann and Charles J. Northrup, both of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellant.

Thomas F. Londrigan and Alexandra de Saint Phalle, both of Londrigan, Potter & Randle, P.C., of Springfield, for appellees.

William F. Trapp, of Brown, Hay & Stephens, of Springfield, for cross-appellee Hanson Engineers, Inc.

Thomas P. Schanzle-Haskins, of Giffin, Winning, Cohen & Bodewes, P.C., of Springfield, and John J. Sabourin, Jr., and Thomas R. Folk, both of Hazel & Thomas, P.C., of Falls Church, Virginia, for cross-appellee Parsons Engineering Science, Inc.

David B. Fischer, of Chlorine Chemistry Council, and David F. Zoll and Donald D. Evans, both of Chemical Manufacturers Association, both of Arlington, Virginia, and Terry F. Quill, of Beveridge & Diamond, P.C., of Washington, D.C., for *amici curiae*.

JUSTICE KUEHN delivered the opinion of the court:

Four Taylorville, Illinois, families filed suit seeking compensatory and punitive damages for negligence and nuisance from Central Illinois Public Service Company (CIPS), Hanson Engineers, Inc. (Hanson), Parsons Engineering Science, Inc. (Parsons ES), and Haztech, Inc., relative to remediation of a particular area located in Taylorville (Site) that formerly was a gas manufacturing plant. All four families had a child afflicted with neuroblastoma, a cancer of the peripheral nervous system. The jury returned a verdict in favor of the four families against CIPS alone. From this verdict, upon which the trial court

entered judgment, CIPS appeals. The four families (plaintiffs) conditionally cross-appeal. We affirm.

## FACTS

I. History of the Site and Remediation

The history of this case begins back in 1892 when a gas manufacturing plant began producing gas at the Site. CIPS purchased the plant in 1912 and continued to produce gas until 1932. The plant was dismantled in 1939, which involved the destruction of the above-ground structures, but a large underground tank and other containers were left buried at the Site. CIPS sold the Site in 1961. In the mid-1980s, the Site was owned by Apple Contractors.

The gasification process used at this particular plant produced tar byproducts, which were commercially beneficial and used for numerous purposes. The byproduct was commonly referred to as coal tar. The specific type produced at the Site was carburetted water gas tar.

In 1980, the United States Congress passed the Comprehensive Environmental Response Compensation and Liability Act of 1980, commonly known as CERCLA, which imposed retroactive liability for the disposal of hazardous waste. 42 U.S.C. § 9601 *et seq.* (1982). Additionally, CERCLA mandated that any person or company that owned and operated a facility involving the use of hazardous substances and later disposed of such substances notify the federal Environmental Protection Agency (USEPA) of the facility's existence. 42 U.S.C. § 9603(c) (1982). CIPS was aware of these reporting requirements, and from memos obtained during the discovery process, it was ascertained that CIPS adopted a policy of not reporting the existence of the underground tanks and containers at former plants, including the Site.

In the early 1980s, CIPS, through its environmental affairs department, conducted on-site visits to all of CIPS's former coal gas plant sites, including Taylorville. The environmental affairs department prepared memos to CIPS management about the sites and about public and regulatory concerns regarding the cancer-causing potential of coal tar.

On October 23, 1985, a contractor hired by Apple Contractors to put in a septic line discovered underground soil contamination in the form of a tar-like substance. After this inadvertent discovery, CIPS's environmental affairs department disclosed information about the Site to the Illinois Environmental Protection Agency (IEPA). Without knowing the hazardous nature of the Site, Apple Contractors removed some surface soil and transported it to a nearby farm owned by the

business's owner, resulting in contamination of the farm. Apple Contractors used the Site for an office and for equipment storage. Following up on a complaint about strange odors, Hanson, at CIPS's direction, started monitoring the Site and nearby areas. Hanson detected high concentrations of volatile chemicals on the Site itself, in the parking lot, and in an adjacent public park. Hanson contacted CIPS with this information, recommending immediate closure of the parking lot. Soil borings confirmed surface soil contamination, as well as contamination below the surface down several hundred feet. Other investigations completed several months later revealed the presence of a high concentration of coal tar in water and sediment some distance from the Site.

With the IEPA involved, CIPS was forced to address the problems at the Site. CIPS maintains that it fully cooperated with the IEPA. Plaintiffs contend that CIPS was at odds with the IEPA throughout the remediation process.

Phase one of the project involved an initial Site assessment. Phase one began the first week of December 1985 and focused on the nature and extent of Site contamination with soil and groundwater analyses. CIPS submitted its phase one report to the IEPA in March 1986. The chemicals discovered at the Site in which the IEPA took special interest were associated with coal tar and were known as polynuclear organic (aromatic) hydrocarbons (PAHs) and volatile organic compounds (VOCs). Some of the PAHs and VOCs found in the soil and groundwater are associated with cancers, but not specifically with neuroblastoma.

PAHs are a product of combustion and can sometimes be found at some levels in homes, tobacco smoke, smoke from burning wood, creosote-treated wood products, and some foods and beverages. VOCs are extensively used in the manufacturing process and are components of many petroleum-based products such as gasoline. VOCs are also found in cigarette smoke.

In July 1986, the IEPA notified CIPS that it would be formally required to complete the plan designed to fully characterize the extent of contamination and to completely remediate the Site. The IEPA's role at the Site was to ensure that the remediation plans were environmentally sound and in keeping with statutory and regulatory standards.

In December 1986, CIPS submitted its phase two report to the IEPA, detailing its remediation plans. Before the beginning of the actual remediation, an air-monitoring program was implemented. The air-monitoring program was designed to provide information to the contractors involved in the remediation. If the ambient concentrations

of certain compounds approached certain defined action levels, the Site supervisors could take action to shut the remediation actions down. The air-monitoring program also called for the identification of an exclusion perimeter around the Site from which the general public would be excluded. The air was continuously monitored from a date before remediation began until late July 1987. From July 1987 until April 1989, CIPS continued to take weekly VOC measurements at various points around the perimeter of the Site. Particulate monitoring ceased in April 1987.

The remediation began on January 20, 1987, and its initial phase lasted until February 26, 1987. Some soil removal continued for a few weeks thereafter in an area south of the primary remediation area. The assessment and initial remediation work was conducted by Hanson, Parsons ES, and Haztech, Inc., at CIPS's direction and pursuant to IEPA oversight. During the remediation, building debris, one gas holder and two separators (underground structures), and 9,000 cubic yards of excavated soil were removed and disposed of. At the IEPA's insistence, CIPS did not backfill the excavated area until the IEPA could determine whether additional soil needed to be removed. In an attempt to reduce dust emissions and volatilization, CIPS covered the hole with styrofoam and plywood sheets.

During the 1987 remediation, the air at the Site exceeded the USEPA's National Ambient Air Quality Standards (NAAQS) for particulate emissions on at least seven days. As it came time to excavate the area of the buried tank, all workers were required to wear gas masks and protective clothing. At this time, Hanson and Parsons ES discussed the relocation of nearby residents, but CIPS declined to take this action. In early February, Taylorville experienced some unseasonably warm and especially windy weather. On February 10, 1987, the air-monitoring station to the north reported an NAAQS violation. On this same date, a nearby resident became ill with an intense headache, nausea, blurred vision, and convulsions requiring emergency treatment. Her diagnosis upon discharge was that the acute attack was caused by some toxic cause. At around the same time, truck drivers hired to haul the waste away complained of headaches and nausea. The truck drivers were told that they were required to wear respirators when in the Site area.

Particulate matter varies in size and can be small enough to be easily respirable. Wind speed and direction influence dust emissions.

The excavation remained open until April 1989. CIPS and the IEPA maintained various technical disagreements during this two-year-plus time frame. The disagreement related to the scope of a further remedy for groundwater at the Site. Eventually, the IEPA agreed

with CIPS's assessment of the situation and allowed the hole to be backfilled. With the IEPA's approval, continuous air monitoring at the Site ceased in July 1987. Any additional NAAQS violations, if any, were not detected.

The final remedial action is currently underway at the Site. CIPS was required to construct and operate a groundwater pump and treatment system. The system is currently operating and will be maintained until the IEPA's groundwater cleanup objectives are met.

II. Plaintiffs

The minor plaintiff Zachary Donaldson was conceived in December 1987 and was born on September 7, 1988. He was diagnosed with neuroblastoma in March 1989. From August 1986 until March 1987, the Donaldson family resided approximately one mile from the Site. In March 1987, the Donaldsons moved to a site approximately three-quarters of one mile from the Site. The Donaldsons do not remember specifics of any exposures.

The minor plaintiff Chad Hryhorysak was conceived in April 1989 and was born on January 12, 1990. He was diagnosed with neuroblastoma in March 1990. From 1985 to 1989, the Hryhorysak family resided approximately three miles from the Site. The Hryhorysaks also know few specifics about any exposures but do know that they visited the public park on several occasions during the relevant time frame.

The minor plaintiff Erika May was conceived in February 1989 and was born on November 27, 1989. She was diagnosed with neuroblastoma in January 1990. The May family moved around quite a bit over the years, and so from 1985 until 1989, they resided anywhere from one-half of one mile to eight miles from the Site. Erika's mother knows that she was in the public park adjacent to the Site but cannot provide specific dates. Otherwise, few specifics are known about any exposures.

The plaintiff's minor decedent Brandon Steele was born on March 17, 1978. He was diagnosed with neuroblastoma on August 9, 1991. Brandon Steele passed away on January 18, 1993. At their residence, the Steeles were not on city water. Their water came from a well located on their property. Their water was tested and showed no signs of contamination. From 1985 to 1989, the Steeles resided approximately two miles from the Site. The Steeles know few details about any exposures.

III. Neuroblastoma and Expert Testimony

Everyone is in agreement that the number of neuroblastoma cases

in Taylorville is statistically above normal. The cause of those neuroblastomas was the focal point of this case.

Statistically, 9 out of every 1 million children born develop neuroblastoma. In 1988, Christian County, where Taylorville is located, registered 520 live births. The fact that four Christian County children developed neuroblastoma within the span of a little over two years is overwhelming.

As of yet, there is no established precise cause of neuroblastoma. Neuroblastoma is a type of cancer, and as stated earlier, it involves the peripheral nervous system.

Plaintiffs allege that the statistical excess of neuroblastoma cases for the area can only be connected to the contaminants released at the Site.

Plaintiffs provided three experts to connect the neuroblastomas and the Site. Plaintiffs called an epidemiologist specializing in childhood cancers, a toxicologist who also specializes in molecular biology, and a medical doctor specializing in occupational and environmental medicine.

Defendants provided numerous experts, including the children's treating physicians, to testify that since the cause of neuroblastoma remains uncertain, they could not testify within a reasonable degree of medical certainty that toxic exposures from the Site caused these particular neuroblastomas.

More specific details about the experts and their testimony are included throughout this opinion.

IV. Procedural History and Verdict

This suit was originally filed in Christian County on November 26, 1991. The original suit was filed on behalf of the Mays and the Hryhorysaks against CIPS and Hanson. That case came to our court by interlocutory appeal from the Director of the Illinois Department of Public Health. See *May v. Central Illinois Public Service Co.*, 260 Ill. App. 3d 41, 633 N.E.2d 97 (1994). Ultimately, in September 1995, the original case was voluntarily dismissed. Three months later, the case was refiled in Sangamon County, where CIPS's business is principally located. This case added plaintiffs and Parsons ES and Haztech, Inc., as defendants. In February 1996, the case was transferred to Christian County based upon the defendants' joint motion for forum *non conveniens*.

Before trial, Haztech, Inc., settled with plaintiffs. The trial court dismissed the Steeles' claims against Hanson and Parsons ES on statute of limitations grounds. The trial court refused plaintiffs' request to submit a punitive damages claim to the jury. The trial court also

dismissed all of the claims except the claim for professional negligence against Hanson and Parsons ES. The case proceeded to trial against the remaining three defendants.

After a four-month trial, the jury returned verdicts in favor of Hanson and Parsons ES and against CIPS. Plaintiffs' verdicts against CIPS totaled $3.2 million. Judgment on the jury's verdict was entered on March 27, 1998. CIPS's posttrial motion was denied on September 28, 1998. CIPS appeals.

## CIPS'S APPEAL

### I. Admission of Plaintiffs' Experts' Testimony

CIPS initially argues that plaintiffs did not establish a proximate causation between site chemicals and the cases of neuroblastoma through the testimony of its expert witnesses. The first portion of this argument is that the trial court committed reversible error because the court denied CIPS's request for a *Frye*[1] hearing relative to plaintiffs' experts' anticipated testimony.

### A. Waiver

■ Before we can even address this issue, plaintiffs assert that CIPS waived the issue. Plaintiffs assert that CIPS is seeking judgment notwithstanding the verdict (*n.o.v.*)—not a new trial—and in the case of a judgment *n.o.v.*, "error[s] in the admission or rejection of evidence" are not preserved for review. *Bryant v. Livigni*, 250 Ill. App. 3d 303, 310, 619 N.E.2d 550, 556 (1993). Having reviewed CIPS's brief on appeal, its posttrial motion, and its notice of appeal, it is clear that CIPS did seek a new trial and, in the alternative, sought judgment *n.o.v.* Therefore, the issue is not waived.

### B. Standard of Review

■ On appeal of a *Frye* ruling, we must determine whether or not the trial court abused its discretion by allowing the testimony of plaintiffs' expert witnesses. See *People v. Miller*, 173 Ill. 2d 167, 187, 670 N.E.2d 721, 731 (1996). Instead of the abuse of discretion standard, CIPS argues that we should apply a *de novo* standard applied in other states because the trial court would not even allow its *Frye* hearing request and because the matters in issue about which plaintiffs' experts testified present the "threshold question of whether a scientific technique has achieved general acceptance in the relevant scientific community" (*Miller*, 173 Ill. 2d at 204, 670 N.E.2d at 739 (McMorrow, J., specially concurring)).

---

[1]*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

We decline to adopt the *de novo* standard of review utilized by other states,[2] and we will follow Illinois's abuse of discretion standard. An abuse of discretion only occurs if no reasonable person could adopt the position the trial court assumed. See *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176, 685 N.E.2d 871, 876 (1997).

## C. *Frye*

■ In Illinois, the admission of scientific evidence is strictly governed by the standard enunciated in *Frye*. See *People v. Eyler*, 133 Ill. 2d 173, 211, 549 N.E.2d 268, 285 (1989); *Duran v. Cullinan*, 286 Ill. App. 3d 1005, 1010, 677 N.E.2d 999, 1003 (1997). Simply stated, the *Frye* rule allows the admission of evidence when the scientific principle that forms the basis of the evidence has achieved general acceptance in the evidence's particular field. *Frye*, 293 F. at 1014. However, Illinois law does not mandate a *Frye* hearing. A hearing is only required in situations where the evidence at issue is not commonly recognized in the scientific field in which it belongs.

In arguing that allowing the jury to hear plaintiffs' experts' testimony resulted in the commission of reversible error, CIPS contends that this evidence would have failed the *Frye* test had that test been given. In simpler terms, CIPS argues that this evidence is unreliable because there has been no scientific study directly linking neuroblastoma to the types of carcinogens involved in this case. The testimony at issue was provided by plaintiffs' epidemiology and environmental toxicology experts.

## D. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), the United States Supreme Court concluded that the general-acceptance-in-the-scientific-community test set forth in *Frye* did not survive adoption of the Federal Rules of Evidence. *Daubert*, 509 U.S. at 587, 125 L. Ed. 2d at 479, 113 S. Ct. at 2793. The Supreme Court provided the following items to be considered by the trial court in determining whether the scientific evidence at issue is sufficiently reliable:

1. Is the theory or technique testable and has it been tested?

2. Has the theory or technique been subject to peer review publication?

---

[2]See *Hadden v. State*, 690 So. 2d 573, 579 (Fla. 1997); *State v. Tankersley*, 191 Ariz. 359, 365, 956 P.2d 486, 492 (1998); *Lindsey v. People*, 892 P.2d 281, 290 (Colo. 1995); *State v. Copeland*, 130 Wash. 2d 244, 255, 922 P.2d 1304, 1312 (1996).

3. What is the known or potential error rate of the scientific technique and are there standards controlling the technique's operation? and

4. Has the technique received widespread acceptance?

*Daubert*, 509 U.S. at 593-94, 125 L. Ed. 2d at 483, 113 S. Ct. at 2796-97. Our supreme court has declined to adopt the *Daubert* test in place of the *Frye* test. See *People v. Miller*, 173 Ill. 2d 167, 670 N.E.2d 721 (1996); *People v. Moore*, 171 Ill. 2d 74, 662 N.E.2d 1215 (1996); *Harris v. Cropmate Co.*, 302 Ill. App. 3d 364, 706 N.E.2d 55 (1999).

### E. *Duran v. Cullinan*

Plaintiffs cite *Duran v. Cullinan*, 286 Ill. App. 3d 1005, 677 N.E.2d 999 (1997), in support of their argument that the testimony of their experts was consistent with the scientific method utilized in that case.

*Duran* was a medical malpractice action brought by a minor and her mother for birth defects suffered by the minor as a result of the mother's consumption of oral contraceptives by prescription during pregnancy. Ellen Duran suspected that she was pregnant and went to see her gynecologist, Dr. Cullinan. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1000. For some reason, Dr. Cullinan was not able to see Ellen on that date, and she saw a family practitioner in the same medical group to which Dr. Cullinan belonged. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1000. The family practitioner, Dr. Haan, ordered a pregnancy test and physically examined Ellen. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1000. Neither the test nor the examination gave any indication that Ellen was pregnant, but the test and examination were insufficient to completely rule out pregnancy. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1000-01. The family practitioner gave Ellen a prescription for Ovulen-21, an oral contraceptive, with orders to begin taking the drug. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1001. When she began taking Ovulen-21, Ellen was 27 days pregnant. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1001. Ellen took one cycle's worth of the drugs before discovering her pregnancy. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1001.

Ellen's daughter, Lindsay, was born with multiple birth defects, including mental retardation, hearing, speech, and vision impairments, developmental delay, and facial dysmorphic features. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1000. Ellen had two other children, older than Lindsay, who had birth defects. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1000.

Ellen filed a medical malpractice suit against Dr. Cullinan, Dr. Haan, and their medical group. *Duran*, 286 Ill. App. 3d at 1006, 677 N.E.2d at 1000. The requisite affidavit attached to her complaint was

prepared by a physician who specialized in obstetrics and gynecology. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1001. This physician opined that the defendants' acts of failing to rule out pregnancy and prescribing Ovulen-21 resulted in Lindsay's birth defects. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1001. Two of Lindsay's treating physicians, both of whom were experts in medical genetics, provided opinions that Lindsay's birth defects were not the result of Ellen's ingestion of Ovulen-21. *Duran*, 286 Ill. App. 3d at 1007, 677 N.E.2d at 1001. Two other expert witnesses testified that they were unaware of any teratogenic impact of Ovulen-21. *Duran*, 286 Ill. App. 3d at 1008, 677 N.E.2d at 1001.

During the course of pretrial discovery, the defendants filed amended Supreme Court Rule 220 (134 Ill. 2d R. 220) interrogatories requesting, in part, the basis for the plaintiffs' experts' opinions that Ovulen-21 caused Lindsay's birth defects. *Duran*, 286 Ill. App. 3d at 1008, 677 N.E.2d at 1001. In response, the plaintiffs filed interrogatory answers on behalf of their eight expert witnesses, citing a 1977 Federal Drug Administration rule requiring patient warnings with progestational agents. *Duran*, 286 Ill. App. 3d at 1008, 677 N.E.2d at 1001. The answers further detailed that additional supporting confirmation from Ovulen-21 and Lindsay's birth defects were "extrapolated from a wide variety of defects appearing in the literature." *Duran*, 286 Ill. App. 3d at 1008, 677 N.E.2d at 1001. In support of this extrapolation theory, the plaintiffs cited 43 different studies linking birth defects to progestational agents (presumably including oral contraceptives, although not specifically Ovulen-21) and concluding that oral contraceptives have significant teratogenic potential. *Duran*, 286 Ill. App. 3d at 1008, 677 N.E.2d at 1001-02.

The defendants filed motions to strike the plaintiffs' Rule 220 interrogatory answers and for summary judgment, arguing that the opinions of the plaintiffs' expert witnesses lacked reliability, the touchstone for admission. *Duran*, 286 Ill. App. 3d at 1008-09, 677 N.E.2d at 1002. More specifically, the defendants argued that the extrapolation method used by the experts to reach their causation opinions did not meet the standard required by *Frye*. *Duran*, 286 Ill. App. 3d at 1009, 677 N.E.2d at 1002.

The trial court concluded that the extrapolation technique was not commonly accepted in that particular scientific community and that the plaintiffs' experts' conclusions were, thus, inadmissible under the *Frye* standard. *Duran*, 286 Ill. App. 3d at 1006-07, 1011, 1013, 677 N.E.2d at 1000, 1003, 1004. The trial court granted the defendants' motions for summary judgment. *Duran*, 286 Ill. App. 3d at 1006, 677 N.E.2d at 1000.

On appeal, the appellate court concluded that while *Duran* and *Daubert* both involved the science of teratology, *Duran* was clearly different in that the plaintiffs' experts were able to point to 43 different studies connecting progesterone-based drugs to numerous birth defects, including some of the defects with which Lindsay was born.[3] *Duran*, 286 Ill. App. 3d at 1012, 677 N.E.2d at 1004. Citing to another federal appellate decision, the court determined that the Durans were not "required to present an epidemiological study showing the exact type of defect as long as the plaintiffs' experts' methodology in reaching their conclusions as to causation was sound." *Duran*, 286 Ill. App. 3d at 1012, 677 N.E.2d at 1004, citing *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1535-36 (D.C. Cir. 1984). Finally, the court reasoned that while the Durans could not point to any article discussing the acceptance of the extrapolation method within the field of teratology, the defendants pointed to no articles against the extrapolation method and the extrapolation method was not very likely to have been the subject of scientific articles. *Duran*, 286 Ill. App. 3d at 1012, 677 N.E.2d at 1004.

The appellate court concluded that the trial court abused its discretion and that the plaintiff's experts could testify as to causation using the extrapolation method, specifically finding that the extrapolation method was generally accepted within the field.

### F. Harris v. Cropmate Co.

CIPS cites *Harris v. Cropmate Co.*, 302 Ill. App. 3d 364, 706 N.E.2d 55 (1999), to support its theory that plaintiffs' experts' testimony should have been inadmissible. In *Harris*, farmers sustained crop damage from a herbicide spread on an adjacent field. *Harris*, 302 Ill. App. 3d at 365, 706 N.E.2d at 58. The Fourth District Appellate Court provided a framework for analyzing *Frye* issues, concluding that Illinois utilizes a *Frye*-plus-reliability standard for admission of scientific evidence. *Harris*, 302 Ill. App. 3d at 368, 706 N.E.2d at 60.

On appeal, we are determining whether or not the trial court abused its discretion in allowing plaintiffs' experts' testimony into evidence. As *Harris* had not been decided at the time the trial court made its decision, the trial court was not bound by *Harris* to the extent that *Harris* represents new law. See *People v. Heaton*, 266 Ill. App. 3d 469, 478, 640 N.E.2d 630, 636 (1994). However, because of

---

[3]In *Daubert*, extensive epidemiological studies could find no statistically significant link between the prescription drugs at issue and birth defects. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 951 F.2d 1128, 1129 (9th Cir. 1991).

*Harris*'s somewhat unique approach to the admission of novel evidence, we review the case.

■ The *Harris* court noted that "[t]he decision whether to change long-standing, fundamental rules of Illinois evidence law lies within the discretion of the Supreme Court of Illinois, not this court." *Harris*, 302 Ill. App. 3d at 366, 706 N.E.2d at 59. Therefore, the *Harris* court did not view its decision as a change from established Illinois evidentiary law. The court declined to adopt the admissibility standards enunciated in *Daubert*, as that would mark a change in Illinois law. See *Harris*, 302 Ill. App. 3d at 365, 706 N.E.2d at 58. However, in *Harris*, the court does not base its reliability addition to the *Frye* test on established supreme court law. See *Harris*, 302 Ill. App. 3d at 368, 706 N.E.2d at 60. Instead, the *Harris* court relied upon Professor Michael Graham and the sixth edition of his Handbook of Illinois Evidence, stating, "[F]ollowing Professor Graham's lead, it *appears* that Illinois utilizes a 'Frye plus reliability' standard for admission of 'novel scientific evidence.' " (Emphasis added.) *Harris*, 302 Ill. App. 3d at 368, 706 N.E.2d at 60, citing M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 702.4, at 559-63 (6th ed. 1994). In the section of Professor Graham's handbook cited by the court, reliability is discussed. However, these discussions are without Illinois citations. Professor Graham's discussion seems to analyze the evidence as being "reliable" as part of, and by virtue of its acceptance within, the relevant scientific community. Furthermore, another fourth district case cited in this discussion clearly explains that "general scientific acceptance is not a prerequisite if the evidence is otherwise shown to be reliable." *People v. Hendricks*, 145 Ill. App. 3d 71, 98, 495 N.E.2d 85, 104 (1986), *rev'd on other grounds*, 137 Ill. 2d 31, 560 N.E.2d 611 (1990). So, in our view, Illinois law does not require a separate test of reliability in addition to *Frye*'s requirement of general acceptance within the scientific community with its inherent reliability component. Reliability is something that naturally follows from acceptance within a particular scientific community. Alternatively, evidence, otherwise reliable, need not meet the *Frye* standard. Therefore, we disagree with the Fourth District Appellate Court with respect to the addition of a separate reliability component. As we are not bound by decisions of the other appellate districts, we decline to follow *Harris*. See *State Farm Fire & Casualty Co. v. Yapejian*, 152 Ill. 2d 533, 539, 605 N.E.2d 539, 542 (1992).

G. Analysis

■ We are aware that the trial court's October 21, 1997, order denying CIPS's request for a *Frye* hearing does not thoroughly explain

its reasoning. The trial court's order of that date dealt with 30 separate motions or issues and was nine pages in length. Given the plethora of issues facing the trial court on that date, we find it completely practical that each issue decided was not thoroughly outlined. Reviewing the extremely lengthy transcript of the hearing relative to this *Frye* issue, as well as the proximate-causation issue discussed below, we note that the trial court was amply aware of the *Duran* decision and its duty to abide by appellate decisions on the issues before the court. We can affirm the trial court's rulings on the admission of evidence for any reason found in the record. See *Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C.*, 279 Ill. App. 3d 469, 477, 664 N.E.2d 1125, 1130 (1996).

Furthermore, without addressing the substance of this issue, we do not find that the trial court's failure to specifically hold a *Frye* hearing constituted an abuse of discretion. CIPS's request for a *Frye* hearing came late in the game. The issue of the admissibility of plaintiffs' experts' testimony came before the court in other motions. As in *Duran*, the trial court can render a decision utilizing *Frye* without actually holding a *Frye* hearing. We agree with the trial court that holding such a hearing so close to trial would have been unproductive.

Addressing the substance of this particular *Frye* issue, we find that *Duran* is controlling. Plaintiffs' toxicology and epidemiology experts cannot specifically link neuroblastoma to the carcinogens involved. However, they are able to point to numerous studies directly linking those same carcinogens to other forms of cancer. Extrapolating from these studies, the experts conclude that, logically, the carcinogens could have caused the neuroblastomas at issue in this case. While obviously these are not terribly strong opinions, they are causation opinions utilizing the accepted extrapolation method and are therefore admissible under *Frye*. As the appellate court stated in *Duran*, the fact that the experts must resort to extrapolation instead of pointing to a single epidemiological study "affects the weight of the testimony and not its admissibility." *Duran*, 286 Ill. App. 3d at 1013, 677 N.E.2d at 1004.

It was within the trial court's discretion "to determine whether the underlying facts or data upon which an expert bases an opinion are of a type reasonably relied upon by experts in the particular field." *City of Chicago v. Anthony*, 136 Ill. 2d 169, 186, 554 N.E.2d 1381, 1389 (1990). We find no basis to conclude that the trial court abused that discretion.

## II. Proximate Cause

■ CIPS initially argues that plaintiffs were required to prove both generic and specific causation within reasonable certainty. CIPS defined generic causation as that causal link between the substances at the Site and neuroblastoma. CIPS defined specific causation relative to the facts of this case as plaintiffs' requirement to show that exposure to Site chemicals and substances actually caused plaintiffs' neuroblastomas. We have reviewed CIPS's authority on this subject.[4] What CIPS is referring to is nothing unique to toxic tort litigation but is the stuff learned by all first-year law students regarding tort law—to establish negligence, the plaintiff must prove both causation and proximate causation. Therefore, there are no heightened causation rules applicable to the plaintiffs in this case.

■ CIPS next argues that plaintiffs' experts' testimony was inherently unreliable and should not have been admitted. The decision to admit expert testimony is within the trial court's discretion. See *Grant v. Petroff*, 291 Ill. App. 3d 795, 801, 684 N.E.2d 1020, 1025 (1997). Expert testimony is admissible if the proffered expert is qualified as an expert by knowledge, skill, experience, training, or education and the testimony will assist the trier of fact in understanding the evidence. See *Grant*, 291 Ill. App. 3d at 801, 684 N.E.2d at 1024-25. Where the trial court must decide to admit or exclude the entire opinion testimony of an expert, the court should liberally allow that expert to determine what materials are reasonably relied upon by those in his field. See *La Salle National Bank v. Malik*, 302 Ill. App. 3d 236, 241, 705 N.E.2d 938, 942 (1999). We now turn to the specific issues raised by CIPS in this portion of its argument.

■ Contrary to CIPS's argument, an expert's causation testimony is not inadmissible simply because it is "couched in terms of probabilities or possibilities based upon certain assumed facts." *McKenzie v. SK Hand Tool Corp.*, 272 Ill. App. 3d 1, 8, 650 N.E.2d 612, 617 (1995); see *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 108, 679 N.E.2d 1202, 1211 (1997).

Plaintiffs correctly argue the state of Illinois law that when the cause or etiology of a specific disease is not known, or is otherwise unclear, proof of causation is not quite as stringent. The cases citing this rule originate in worker's compensation law. See *Quaker Oats Co. v. Industrial Comm'n*, 414 Ill. 326, 111 N.E.2d 351 (1953); *Mechanics Universal Joint Division, Borg-Warner Corp. v. Industrial Comm'n*, 21

---

[4]See *Johnson v. Tipton*, 103 Ill. App. 3d 291, 431 N.E.2d 464 (1982); *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 603 N.E.2d 449 (1992); *Kerns v. Engelke*, 76 Ill. 2d 154, 390 N.E.2d 859 (1979).

Ill. 2d 535, 173 N.E.2d 479 (1961); *United States Steel Corp. v. Industrial Comm'n*, 32 Ill. 2d 68, 203 N.E.2d 569 (1964); *National Castings Division of Midland-Ross Corp. v. Industrial Comm'n*, 55 Ill. 2d 198, 302 N.E.2d 330 (1973); *Dixon v. Industrial Comm'n*, 60 Ill. 2d 126, 324 N.E.2d 393 (1975). While the original cases dealt with worker's compensation law, the law has since been applied in civil cases. See *Robinson v. Chicago Transit Authority*, 69 Ill. App. 3d 1003, 388 N.E.2d 163 (1979); *Swartz v. Sears, Roebuck & Co.*, 264 Ill. App. 3d 254, 636 N.E.2d 642 (1993). The oft-quoted statement from *National Castings Division of Midland-Ross Corp.*, concludes, "Where, as here, there exists limited medical knowledge of a malady, we have recognized that medical testimony pertaining to causation may not be unqualified and unequivocal." *National Castings Division of Midland-Ross Corp.*, 55 Ill. 2d at 204, 302 N.E.2d at 333. In 1973, when the supreme court decided *National Castings Division of Midland-Ross Corp.*, the cause of the plaintiff's ailment, multiple sclerosis, was unknown. See *National Castings Division of Midland-Ross Corp.*, 55 Ill. 2d at 200-01, 302 N.E.2d at 331-32. Despite the fact that the cause of such a debilitating condition was unknown, the supreme court allowed causation testimony into evidence. This is so because, in the format of a worker's compensation case, the Industrial Commission must resolve conflicting medical evidence. See *National Castings Division of Midland-Ross Corp.*, 55 Ill. 2d at 203, 302 N.E.2d at 333. Similarly in civil cases, when there is a conflict in the testimony of expert medical witnesses, the jury must determine the witnesses' credibility. See *Robinson*, 69 Ill. App. 3d at 1009, 388 N.E.2d at 167.

We find *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C. Cir. 1984), of particular significance. Richard Ferebee worked for an agricultural research center, and during his employ, he was repeatedly exposed to paraquat, an herbicide exclusively distributed in the United States by Chevron Chemical Co. (Chevron). *Ferebee*, 736 F.2d at 1532. Richard Ferebee contracted pulmonary fibrosis and eventually died. *Ferebee*, 736 F.2d at 1532-33. In this products liability suit, at issue was whether Richard Ferebee's pulmonary fibrosis was caused by long-term skin exposure to paraquat. *Ferebee*, 736 F.2d at 1535. On the basis that Chevron did not adequately label paraquat to warn that long-term skin exposure could cause serious lung disease, the jury returned a verdict in favor of Richard Ferebee's estate. *Ferebee*, 736 F.2d at 1533. On appeal, Chevron raised numerous issues, including causation. *Ferebee*, 736 F.2d at 1535. Chevron argued that the expert testimony provided on Ferebee's behalf was novel and not generally accepted in the scientific community. *Ferebee*, 736 F.2d at 1535. Ferebee's experts testified to a causal relationship between his paraquat exposure and his pulmonary disease. *Ferebee*, 736 F.2d at 1533.

Chevron's experts testified that paraquat is toxic, but only acutely, and as Ferebee's last paraquat exposure was 10 months prior to his pulmonary diagnosis, causation could not be presumed. *Ferebee*, 736 F.2d at 1535.

■ In concluding that the testimony of Ferebee's experts was properly admitted, the appellate court stated:

> "[A] cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound ***, products liability law does not preclude recovery until a 'statistically significant' number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical. *** That Ferebee's case may have been the first of its exact type, or that his doctors may have been the first alert enough to recognize such a case, does not mean that the testimony of those doctors, who are concededly well qualified in their fields, should not have been admitted." *Ferebee*, 736 F.2d at 1535-36.

■ As in *Ferebee* and following established Illinois law, we do not believe that plaintiffs were required to prove with 100% certainty that neuroblastoma was caused by the carcinogens to which plaintiffs were exposed. What is clear is that many components of coal tar are toxic and carcinogenic in nature. Coal tar has not been specifically linked to neuroblastoma. Expert testimony during this trial supported and disputed the causal link. We conclude that plaintiffs' experts were correctly allowed to testify to a causal link despite the lack of a statistical number of others with neuroblastoma and a history of coal tar exposure. Worldwide, there is a limit to funding for the research into the causes of many fatal and otherwise debilitating diseases. Just because presently there is no study connecting coal tar to neuroblastoma does not exclude coal tar as the cause. Coal tar is known to cause cancer. Coal tar could very easily have caused the neuroblastomas at issue in this case. The jury was presented with testimony as to each possibility. As stated previously, the lack of studies connecting the two is something that the jury had to weigh in considering the expert testimony. The weight of the testimony simply does not affect its admissibility. To hold otherwise unfairly penalizes injured parties. A frequently quoted passage from *Frye*, equally germane in the causation setting, states:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized ***." *Frye*, 293 F. at 1014.

■ In Illinois, an expert also does not need to quantify the specific level of exposure to environmental chemicals. See *La Salle National Bank v. Malik*, 302 Ill. App. 3d 236, 240-43, 705 N.E.2d 938, 941-43 (1999). Our supreme court has even found that testimony of dust's existence throughout a plant sufficed to prove occupational exposure without regard to individual exposures. See *Thacker*, 151 Ill. 2d at 366, 603 N.E.2d at 460.

■ Turning to the facts of this particular case, we find the following evidentiary items to be of interest and applicable to this issue.

For two years beginning in April 1987, which followed the immediate removal action, particulate air emissions from the open Site were essentially uncontrolled and unmonitored.

The Site was allowed to be left open for a period of two years. The area was not backfilled until April and May of 1989. Exposures are not limited to the two months of excavation but also could have occurred until the spring of 1989 backfilling. Some contaminated soil remains unremediated.

Without testing the soil, CIPS represented to the IEPA that the soil was not contaminated. However, after the surface soil was removed and transported to the Horton farm, it was found to contain coal tar. In fact, the coal tar levels were even higher than those found at subsurface levels. Because it was not known that the soil was contaminated, any calculations regarding air emissions based upon the lack of soil contamination could not have been accurate.

Much damage can occur to prezygotic mothers and fathers with the parent-to-be appearing healthy. But the child, ultimately conceived from the damaged ovum or sperm, may not be as healthy. Developing fetuses are much more sensitive to carcinogenic exposures. Experts testified regarding studies on prepregnancy maternal exposure as increasing the cancer risks to the later-conceived child.

Plaintiffs concede that they cannot quantify individual exposures. At trial, there was testimony that the affected radius was four miles from the Site. All plaintiffs lived within four miles of the Site. Furthermore, some of the plaintiffs testified that they frequented Manners Park, as well as nearby homes and businesses. Additionally, there was undisputed testimony at trial that particulate matter can travel hundreds of miles from its origin.

To summarize and simplify, all plaintiffs fall into the realm of possible exposures. We therefore conclude that there was adequate evidence of causation with respect to plaintiffs' exposures to the carcinogens involved.

Accordingly, we conclude that summary judgment, a directed verdict, or judgment *n.o.v.* would all have been inappropriate. Ad-

ditionally, we find no basis relative to the expert witness and causation issues to reverse the jury's verdict, as, given the variety of evidence the jury heard, the verdict is not contrary to the manifest weight of that evidence.

## PLAINTIFFS' CROSS-APPEAL

Because of our rulings on CIPS's appeal, and plaintiffs' representations that they would not pursue their cross-appeal unless CIPS was granted a new trial, we do not address the merits of plaintiffs' cross-appeal.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Christian County is hereby affirmed.

Affirmed.

GOLDENHERSH, P.J., and MAAG, J., concur.