BARRY KLEISS *et al.*, d/b/a Kleiss Produce Farms, Plaintiffs-Appellants, v. WILLIAM BOZDECH *et al.*, Defendants-Appellees.

Fourth District    No. 4—03—0684

Opinion filed June 9, 2004.

Daniel C. Jones (argued), of Hefner, Eberspacher & Tapella, of Mattoon, for appellants.

Mark E. Jackson and Rhonda L. Heinz (argued), both of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellees.

JUSTICE STEIGMANN delivered the opinion of the court:

In April 2000, plaintiffs, Barry Kleiss and Robert Kleiss, d/b/a Kleiss Produce Farms, filed a complaint against defendants, William Bozdech and Todd Herbert, alleging that Bozdech's and Herbert's use of the herbicide 2,4-D caused damage to crops at Kleiss Farms. In March 2003, Bozdech filed a motion for summary judgment.

In July 2003, Kleiss Farms moved to voluntarily dismiss Herbert as a defendant, and the trial court granted the motion. Following a July 2003 hearing, the court granted Bozdech's motion for summary judgment.

Kleiss Farms appeals, arguing that the trial court erred by grant-

ing Bozdech's summary judgment motion because genuine issues of material fact exist as to whether (1) Bozdech's spraying of 2,4-D was a proximate cause of crop damage at Kleiss Farms and (2) Bozdech breached a duty of care. Because we agree with Kleiss Farms, we reverse and remand.

## I. BACKGROUND

In its April 2000 complaint, Kleiss Farms alleged, in pertinent part, as follows:

"3. On or about April 23, 1998[,] and for some time prior and after thereto, [Bozdech] farmed land located on county road 1450 East, north of the intersection with county road 1450 North.

4. Prior to the incident in question[,] [Bozdech] knew or should have known that [Kleiss Farms] was located within approximately two miles of the land farmed by him.

5. Prior to the incident in question[,] [Bozdech] knew or should have known that [Kleiss Farms] grew crops which were sensitive to certain chemicals and such chemicals presented a danger to [Kleiss Farms'] crops.

6. Prior to the incident in question[,] [Bozdech] knew or should have known that one of such chemicals was 2,4-D.

7. On or about April 23, 1998[,] [Bozdech] sprayed a waterway located on his land with 2,4-D.

8. It was the duty of [Bozdech] to exercise due and proper care for the safety of his neighbor's crops in spraying 2,4-D.

9. Notwithstanding said duty, [Bozdech] was guilty of one or more of the following negligent acts or omissions:

a. Spraying a dangerous chemical when he knew or should have known that such spraying presented a danger to [Kleiss Farms'] fruits and vegetables located a short distance from where [Bozdech] was spraying.

b. Negligently spraying such chemicals when the wind was in a position to cause wind drift and subsequent damage to [Kleiss Farms'] crops.

c. Negligently spraying such chemicals when he knew or should have known that the volatility of the chemicals was such that a danger of wind drift of the chemicals lasted for several days after they were applied.

10. As a direct and proximate result of one or more of such negligent acts of [Bozdech,] [Kleiss Farms has] suffered economic loss in that numerous crops were damaged and/or destroyed resulting in a decreased yield and income for [Kleiss Farms]."

In March 2003, Bozdech filed a motion for summary judgment, asserting that Kleiss Farms lacked evidence that (1) Bozdech's application of 2,4-D was the proximate cause of Kleiss Farms' crop damage

and (2) Bozdech breached a duty. A summary of the pertinent evidence contained in discovery depositions follows.

Barry Kleiss testified that he farmed approximately 185 acres and, apart from about 40 acres on which he grew soybeans, he raised fruits and vegetables. On April 27, 1998, Barry first noticed what looked like herbicide damage on his crops. His notes indicated that (1) redbud and apple trees appeared to be showing herbicide damage and (2) tomato plants in the east side of his "high tunnel greenhouse" were possibly damaged.

On May 2, 1998, Barry began investigating surrounding fields. He drove about two miles to the south and the west, and even further to the north and the east. About $1^3/4$ miles northeast of his farm, Barry located a farm where 2,4-D had apparently been used (this farmland was later identified as land farmed by Bozdech). Specifically, Barry saw damage to weeds along a ditch and across the road. He followed the pattern of damage all the way back to Kleiss Farms. Barry found no other evidence of 2,4-D damage in area fields.

Barry acknowledged that for Bozdech's application of 2,4-D to have affected Kleiss Farms' crops, wind would have had to come out of the northeast or blown northeast to southwest. Barry did not know whether the 2,4-D damage was due to spray drift or volatilization.

Riley Foster testified that he received a B.B.S. in agricultural entomology from the University of Wyoming and had been a plant pesticide specialist with the Illinois Department of Agriculture for 25 years. His territory included Vermilion, Champaign, Piatt, and Macon Counties, and a "little chunk" of Douglas County. His job involved (1) inspecting nursery trees and shrubs for diseases and insects, (2) quarantinable insect outbreaks, and (3) investigating pesticide complaints, drift complaints, and formulation complaints. Depending on weather conditions, he spent between 10% and 40% of his time investigating drift complaints.

Foster first went to Kleiss Farms on May 5, 1998, after Barry telephoned him about his crop damage. Foster walked around the whole farm. There was more damage to tomatoes at the northeast end of the greenhouse than at the other end, and the same sort of damage existed outside the greenhouse. The damage looked to Foster like growth regulator hormone herbicide damage. (2,4-D is a growth regulator hormone herbicide.) Foster did not think the damage could have been caused by anything other than exposure to growth regulator hormone herbicide. Foster took some samples of the tomato plants for laboratory analysis.

Foster also noted distortion and death in the new growth on yew bushes on the northeast side of the farmhouse. New growth on yew

bushes is sensitive to growth regulator hormone herbicide. Foster also saw signs of damage to cone flowers on the east side of the house.

Barry told Foster that the only spraying in the area had been in a field about 1½ to 2 miles to the northeast. Foster then drove around the area checking for roadside weed damage. Foster located a field at around 1450 East, north of 1450 North, as being the source of the herbicide that affected Kleiss Farms' crops. Barry told Foster that Bozdech farmed that land. While driving around that day, Foster did not see any other farmland that showed a 2,4-D "burndown."

During a May 8, 1998, telephone conversation, Bozdech told Foster that he had applied Roundup and 2,4-D on the morning of April 23, 1998. He used one pint each of Roundup and 2,4-D per acre. Foster acknowledged that it was common among farmers in central Illinois to use 2,4-D and Roundup. It was not part of Foster's job to inspect spray equipment used in 2,4-D application.

Foster returned to Kleiss Farms on May 12, 1998, because herbicide damage occurs over a period of time and can worsen. He saw more damage on the tomatoes. They were smaller at the northern end of the greenhouse, they were yellowish-green, and their flowers were dropping off. Foster took samples of the most severely damaged tomatoes because they would be most likely to have absorbed enough chemical to be detected.

Foster also gathered weather data for April 23, 1998, and learned that on that day the wind was north-northwest. Thus, Kleiss Farms was not directly in line with wind from Bozdech's farm.

After investigating a complaint of possible improper application of herbicide, Foster submitted a report to the Department. If it was determined that such action was warranted, a warning letter would then be sent to the applicator. Foster was not the person who made such determinations, but if Bozdech had been sent a letter, Foster would have received a copy. Bozdech was not sent a warning letter.

Foster further testified that 2,4-D can vaporize after being applied, move as a vapor gas, and affect sensitive plants. Warmth, humidity, and air movement were necessary for this to occur. He estimated that the temperature had to be 80 to 85 degrees Fahrenheit or warmer. He also estimated that vapor drift would occur within two to three days of application. Based on his past observations, Foster opined that vapor drift could go at least one mile, and particle drift could go further. He further opined that the damage to Kleiss Farms, based on the time frame, was consistent with vapor drift from Bozdech's farm.

The laboratory results on the tomato plant samples that Foster collected on May 5, 1998, indicated that no 2,4-D or Dicamba (another growth regulator hormone herbicide) was detected. Foster explained

those results as follows: "[The laboratory was] unable to pull it out. They could have broken down in the plant in the interim before I collected the sample. And it just makes you wonder about the lab. *** I believe that the plants were affected by 2,4-D. And so it should have been present, or was perhaps not present in a sufficient concentration. I don't know." He added that tomatoes are especially sensitive to 2,4-D exposure.

Finally, Foster opined that Kleiss Farms' crops suffered herbicide damage. It looked more like 2,4-D exposure than Dicamba. When asked if he had an opinion as to the source of the herbicide that caused the damage, Foster said, "no." He further explained that, "[Kleiss Farms] is in a fog of chemicals out there. [It's] surrounded by fields. And it is hard to pinpoint where they may have come from because you never know when they actually connected with the plant and how long it took for the symptoms to be seen." Every year, Kleiss Farms had some damage from growth regulator hormone herbicides. Because the damage in April 1998 was more severe on the north and northeast side of Kleiss Farms, Foster opined that the drift came from the north. The farthest distance that Foster personally had determined growth regulator herbicide to drift and cause damage was one mile.

Walter Black, a laboratory supervisor for the Department of Agriculture, testified, in pertinent part, that tests of the sample from Kleiss Farms showed the presence of 2,4-D; however, it was in an amount that was below what the Department used as the "minimum reporting level." The testing method made it "impossible to tell whether [2,4-D] was entirely absent."

Steven Ries testified that three years earlier, he had retired as an associate professor in natural resources and environmental sciences and an adjunct professor in horticulture and crop sciences. At the end of his career, he spent about 50% of his time working at the University of Illinois extension service, dealing with farmers. The remainder of his time he spent teaching and conducting research.

Ries became interested in researching damage to fruits and vegetables caused by 2,4-D and Dicamba after hearing the complaints of fruit and vegetable growers at the extension service. Ries explained that farming had changed tremendously in the past 5 to 10 years, as farmers adopted "minimum till" and "no till" practices. Thus, in the early spring, farmers now apply herbicide to their fields prior to planting. There is a narrow window of opportunity in which weather conditions are ideal for herbicide application. Farmers need large quantities of herbicide, and 2,4-D is one of the cheapest herbicides available. Ries became aware of a tremendous lack of information about how much damage was caused by the use of such herbicides.

Ries had spent the previous three years applying low doses of 2,4-D, Banvel, and Roundup to apple trees and monitoring the effects. He applied the chemicals at the same time of year that farmers apply the herbicides to their fields. To simulate drift damage, he diluted the concentrations. 2,4-D causes systemic damage rather than contact damage and usually becomes apparent within 12 hours or less.

In 1998, Ries visited Kleiss Farms on March 6, March 30, April 16, and April 23, and saw no signs of crop damage. However, on April 27, 1998, Ries noticed that the redbud tree was starting to show damage. He did not make note of damage to tomato plants on that date. On May 2, 1998, Ries saw 2,4-D damage on the greenhouse tomatoes. The damage was worse on the north and east side. Ries suggested that Barry drive around to the north and east to look for a source of herbicide drift.

On May 7, 1998, Ries returned to Kleiss Farms with Dale Bateman, a former University of Illinois extension advisor. They drove around the edges of fields in the area looking for damage to leaves and weeds in the right-of-ways. Although his deposition is not entirely clear, it appears that Ries identified an area on the plat map where Bozdech had sprayed 2,4-D as the source of the herbicide drift to Kleiss Farms. Ries acknowledged that it was possible that a farmer located in between Bozdech's farm and Kleiss Farms could also have applied a herbicide spray.

On May 12, 1998, Ries returned to Kleiss Farms and saw that the peach trees were not doing well. He did not attribute the peach tree damage to herbicide drift, but to cool weather and a nitrogen deficiency. He acknowledged, however, that the peach trees could have been damaged by herbicide spraying in the previous year. Ries walked through the tomato greenhouse and saw damage that had probably been caused by the April 1998 exposure.

Ries also noticed that Tanzie Mustard and Shepherd's Purse, plants which were growing around the greenhouse, appeared to have been damaged. He took samples of those plants to the University of Illinois plant clinic, where a clinician told him that those plants were affected by downy mildew (*peronospora parasitica*), not exposure to herbicide. However, *peronospora parasitica* could not be the cause of damage to the tomatoes because *peronospora parasitica* would not transfer from a weed to a tomato plant.

Ries concluded that the damage to Kleiss Farms' beans was due to 2,4-D, although he acknowledged that his notes erroneously indicated that he had attributed the damage to *peronospora*. Ries had earlier put a carbon monoxide detector in Kleiss Farms' greenhouse to eliminate carbon monoxide as the cause of the tomato damage. The

greenhouse tested negative for the presence of carbon monoxide. Ries was sure, to a reasonable degree of professional certainty, that Bozdech's field was the source of the 2,4-D damage at Kleiss Farms. He was not 100% sure, but he was reasonably sure.

Ries also explained that there were two kinds of herbicide drift. Particle drift, which occurs with Roundup, is extremely dependent upon wind and drying conditions. Ries initially testified that he had never seen Roundup drift more than 50 or 100 feet. Later in his deposition, Ries stated that he had seen particle drift occur over "a couple of hundred yards" in a strong wind, which he defined as wind in the 20-mile-per-hour range.

Ries further explained that 2,4-D travels via "volatile drift" and will travel considerable distances. 2,4-D can be sprayed on a cool day and then, one or two days later, if the 2,4-D has not incorporated and the temperature rises to between 75 and 85 degrees Fahrenheit, the 2,4-D volatilizes off the surface and, if the wind is blowing, it will move. According to Ries, 2,4-D generally drifts when the temperature is above 80 or 85 degrees Fahrenheit and needs to be applied when the wind is blowing at less than four miles per hour. Ries opined that even if a person followed all the instructions on the 2,4-D label, volatile drift could still occur.

Ries had seen volatilization drift up to about 1 or 1½ miles. This assessment was based on identifying damage and tracing the damage to the nearest source. However, Ries estimated that if certain conditions were met, such as 85 or 90 degree Fahrenheit temperatures with a 20-mile-per-hour wind, 2,4-D would probably go for miles. He further explained that certain plants are more susceptible to 2,4-D damage than others. For example, grapes, redbud trees, and tomatoes are highly susceptible to 2,4-D, while it has no effect on corn. Ries had seen grapes that were "a good mile" away from a railroad or highway right-of-way where such chemicals were frequently used show signs of exposure, such as curling, twisting, and cupping. Ries acknowledged that he was unaware of the weather conditions at the time Bozdech sprayed his field, and he had no opinion as to whether Bozdech did anything improper in applying the chemicals.

Ries further opined that laboratory analysis of plant materials to determine whether they had been exposed to 2,4-D could not be done accurately. Ries had submitted samples from his apple trees to the Department to test for the presence of herbicide. He knew that he had sprayed the sample trees and could see injury, but the gas-liquid chromatography test did not detect it. Ries was not aware of a better testing method.

Ries was not familiar with any publications or research on spray drift that had been produced in the past 6 to 10 years.

Dale Bateman testified that he retired from the University of Illinois extension office in 1991. As an extension service provider, he used to be responsible for investigating spray-drift complaints and educating farmers and other chemical applicators. Dicamba topped the list of chemicals causing spray-drift problems, and 2,4-D was second. Bateman worked for Kleiss Farms as a paid consultant from the time he retired until 1998. He also did consulting work for other people, though primarily on economic matters.

On April 21, 1998, Bateman spent an hour at Kleiss Farms. The tomato crop looked great. The peppers, seedless watermelon, zucchini, and other seedlings also looked good.

On May 5, 1998, Bateman returned to Kleiss Farms and saw 2,4-D-type damage on the greenhouse tomatoes. The damage was more severe on the north end of the greenhouse than the south. Bateman also noticed damage to a redbud tree and yews. The damage was consistent with 2,4-D exposure, but Banvel or Dicamba damage would be similar. A very slight amount of 2,4-D in the air could cause damage to young plants. Bateman also noted seeing 2,4-D damage to Tanzie Mustard and "multi-flower rose" in a field to the northeast. He drove around the area, and as he went north, he saw a path of damage from a farm to the north, heading toward Kleiss Farms. The affected fields were one mile east and one-half mile north of Kleiss Farms.

On May 7, 1998, Bateman returned to Kleiss Farms with Ries. They toured the area to see if any other farm showed signs of being the source of the drift. They stopped and got out of the car several times. Bateman and Ries again determined that Kleiss Farms' crop damage was caused by drift from the fields that appeared to have been sprayed with 2,4-D 1½ miles to the northeast (the Bozdech farm). They traced the spray damage from Bozdech's farm to Kleiss Farms and did not see any spray damage north of the Bozdech farm. No other fields showed a line of damage, and there was no evidence that the herbicide drift came from another direction.

Based on his experience, Bateman opined that 2,4-D could "definitely" drift 1½ miles. He had seen 2,4-D damage at that distance back in the mid-1950s, when 2,4-D had just entered the market. Bateman further testified that factors affecting drift included wind speed, wind direction, spray nozzles, pressure, and droplet size. When asked how much wind velocity would be required for 2,4-D to drift 1½ miles, he opined 5 miles per hour, based on the warning on the label, which advises a user not to spray unless the wind speed is lower than that. Later in his deposition, Bateman testified that he would have to see a label to be sure about the wind-speed advisory. Bateman acknowledged that the formulation of 2,4-D used in the 1950s is not the same as that

used today. Now, there is "low volatile" 2,4-D. Bateman had no opinion as to whether the formulation of 2,4-D as it existed in the 1950s would drift farther or less far than the 1998 formulation. Bateman was not aware of any published studies on drift of 2,4-D.

Bateman acknowledged that he did not know (1) the wind speed on the day Bozdech sprayed, (2) the height of Bozdech's sprayer, (3) the pressure in the sprayer, or (4) the concentration of the 2,4-D. Even without this information, Bateman maintained that, based upon a reasonable degree of scientific certainty, Bozdech's spraying was the source of Kleiss Farms' damage. According to Bateman, those things were all variables, but if you see 2,4-D damage, you see 2,4-D damage. Bateman estimated that if 2,4-D was mixed in a concentration consistent with the label and applied 1 1/2 miles away, with wind speeds of less than 10 miles per hour, you could see damage a day or two after application. Bateman opined that there was no reason to mix 2,4-D with Roundup because Roundup killed all plants.

Bateman's opinion was not changed by the fact that the Department laboratory did not identify 2,4-D in Kleiss Farms' plants. In the past, the Department of Agriculture laboratory had failed to identify the presence of substances that Bateman knew to be present. He further explained that detecting a substance through laboratory analysis "depends on, you know, how careful the sample was taken and what care it had from the field to the laboratory, the length of time from the field to the laboratory, what it was packaged in and, of course, how much time there was from the actual spraying to the time it was taken in the first place."

John Masiunas was disclosed as an expert witness for Kleiss Farms. Masiunas testified in pertinent part that the use of high-volatile 2,4-D had been phased out, and Bozdech had applied a low-volatile 2,4-D. With low-volatile 2,4-D, there is less potential for long-distance drift as well as lower concentrations of 2,4-D in the atmosphere. The literature contains some reports that 2,4-D can drift over substantial distances, going farther than from neighboring field to neighboring field. However, he acknowledged that this area of study is not very well understood.

Masiunas further testified that volatilization is a temperature-related phenomenon. The warmer the temperature, the more likely it is to occur. Masiunas read from the 2,4-D label, "[a]lthough this product is much less volatile than butyl or isopropyl esters at high temperatures (above 95 degrees Fahrenheit) vapors from this product may injure susceptible plants growing nearby." He explained that below 95 degrees Fahrenheit, vaporization would still occur, but as far as the manufacturer was concerned, the temperature at which a user

had to start being very concerned about volatilization was 95 degrees. Weather data showed that the highest temperature between April 23, 1998, and May 5, 1998, was 77 Fahrenheit degrees on April 26, 1998. In lower temperatures, plant injury develops a little slower. To attribute Kleiss Farms' damage to Bozdech, winds would have had to be north or northwest. Wind data showed some wind out of the north, but mostly out of the west during the relevant time period. If Bozdech applied 2,4-D on April 23, 1998, one would expect to see injury to susceptible plants within five days.

Masiunas acknowledged that the damage to Kleiss Farms' plants was consistent with exposure to a growth regulator herbicide, including 2,4-D. He further opined that some of the plants looked like they could have been damaged by flooding; however, he did not believe that flooding was the sole explanation for the damage. The damage was probably due to multiple causes. The damage to peach trees and evergreen trees could not be explained by flooding.

Masiunas opined, with a reasonable degree of scientific certainty, that there was a possibility that Bozdech's April 23, 1998, 2,4-D application caused the damage to Kleiss Farms' crops. He could not eliminate it as a possibility. He believed that the damage was less likely to be the result of volatilization, due to the temperatures and the time frame. He opined that the tomato injuries could not have been caused by spray drift, but he could not eliminate spray drift as a possibility for causing injury to the redbud tree. Ries's report did not change his mind.

Masiunas also testified that he "wouldn't trust [the department] to do residue analysis." He was not aware of any data indicating at what concentration level 2,4-D would cause the symptoms seen on Kleiss Farms' plants.

Bozdech testified that in the early morning on April 23, 1998, he sprayed a 10-acre waterway and a 15-acre field with a mixture containing 2,4-D, Roundup, and 16 gallons of water per acre as a carrier. He also sprayed 75 acres on April 27, 1998, and 62 acres in Fairland on April 28, 1998. When applying the chemicals, Bozdech used a "pull[-]type Bestway Sprayer, 500 gallon with a 40[-]foot boom." He pulled the sprayer with a tractor and went about six miles per hour while running about 25 to 30 pounds of pressure. The boom on the sprayer usually ran 18 to 24 inches off of the ground. He used a flat fan nozzle and did not use a drift retardant. He obtained the herbicide premixed from Illini FS in Tolono. Before spraying, Bozdech checked for wind and noted in his "spray log" that there were north winds blowing at, by his estimation, less than 10 miles per hour. No warning labels or literature came with the chemicals.

Bozdech further testified that he had worked at Kaiser Ag Chemical for two seasons as a spray operator and during one season he was also plant manager. He was a certified private pesticide applicator for several years and received agronomic spray training at the University of Illinois. Bozdech was familiar with the contents of the Illinois Pesticide Applicator Spraying manual and used it to prepare for his certification as a licensed private pesticide applicator.

Bozdech acknowledged that prior to spraying in April 1998, he was aware that Kleiss Farms believed it had a problem with chemicals drifting onto its crops. He recalled receiving registered or certified letters from Barry, some of which he refused. Bozdech opined that practically every soybean or corn field in the area would have been sprayed with something during the spring.

On May 8, 1998, Bozdech received a call from Foster and within a few days, Foster came to see him about Kleiss Farms' chemical complaint. Prior to this, Bozdech had never had a misuse complaint filed against him. He did not receive any citation or warning from the Department as a result of Kleiss Farms' complaint.

Bozdech filed an affidavit with his motion for summary judgment, in which he (1) cited his credentials and training in herbicide application and (2) averred, in pertinent part, that when he sprayed a mixture of Roundup and 2,4-D on April 23, 1998, he (a) was familiar with the Illinois Pesticide Applicator Spraying manual published by the University of Illinois and the label instructions for the use of 2,4-D, (b) complied with the label instructions and sprayed in a manner consistent with his education and training, and (c) estimated the winds at the time to be out of the north at less than 10 miles per hour.

Richard Wilson testified that he earned a bachelor of arts degree in biology from Carleton College in 1961. He also had a masters degree in plant pathology from North Carolina State University and a Ph.D. in plant physiology from Oregon State University. His current area of expertise was pesticide drift, and he had extensive experience with 2,4-D. His experience included research on 2,4-D's effect on crops and aspects of its environmental safety, including drift. He had observed its effects on fruits and vegetables. Wilson was involved with the spray drift task force, an agency created under the auspices of the Environmental Protection Agency to evaluate pesticide drift.

For this case, he had reviewed (1) the depositions of Barry, Bozdech, Foster, and Masiunas; (2) Kleiss Farms' complaint; (3) Bozdech's work sheets; (4) several weather reports, including those from the Urbana-Champaign area; and (5) photographs. He did not go to Kleiss Farms.

Wilson testified that farmers have a duty to apply chemicals in

such a way as not to cause damage to other farmers' fields or crops. He acknowledged that it would be a violation of that duty not to follow label instructions.

Wilson opined that the procedures Bozdech followed in applying 2,4-D on April 23, 1998, were consistent with an acceptable standard of care. He acknowledged that spray drift can occur even when wind speeds are as low as 10 miles per hour and explained that whether drift occurs depends on more than just wind speed. All of the circumstances of the application combined are relevant to assessing likelihood of drift. The farthest Wilson had ever seen spray drift of 2,4-D was a distance of 3,000 to 3,500 feet, which is slightly over one-half mile.

Wilson also explained volatilization in detailed and scientific terms. Based on his examination of the relevant data, Bozdech's application of 2,4-D on April 23, 1998, did not damage Kleiss Farms' crops through volatilization. Under the then-existing weather conditions, vapor containing 2,4-D would have gone into the atmosphere and would not have come down.

Wilson further opined that if Kleiss Farms' tomatoes had been damaged by 2,4-D exposure, 2,4-D would have been detected in the laboratory analysis. He explained that a significant amount of 2,4-D would have to be present to cause the degree of damage the tomato plants were showing. He further opined that Kleiss Farms' tomato damage was consistent with causes other than 2,4-D exposure. The injury could have been caused by fungal disease, insect damage, or cold temperatures. If the injury was caused by 2,4-D drift, Wilson would expect to see more weed death in the surrounding area.

Following a July 2003 hearing on Bozdech's motion for summary judgment, the trial court granted Bozdech's motion.

In so doing, the court wrote, in pertinent part, as follows:

"4. [Kleiss Farms'] experts, [Bateman] and [Ries,] gave the opinion that the source of the chemical damage was the waterway sprayed by Bozdech. Their opinion was based on their observation of what they identified as 2,4-D damage in an area around the field sprayed by Bozdech and in areas between the field sprayed by Bozdech and the Kleiss property. [Kleiss Farms'] experts did not present a scientific analysis or basis for their opinions.

5. [Kleiss Farms'] expert, [Masiunas], gave the opinion that Bozdech's spraying on April 23, 1998[,] could not have been the cause of damages claimed by [Kleiss Farms]. [Masiunas] provided a reasoned analysis based on scientific study in support of his opinion.

6. [Bozdech's] expert, [Wilson] gave the opinion that Bozdech's

spraying could not have caused the damages claimed by [Kleiss Farms]. [Wilson's] opinion was based on reasoned analysis and scientific study.

7. [Foster], the Department of Agriculture investigator, could not determine a source of the herbicide damage after investigating the matter.

8. A laboratory analysis performed by [the Department] did not detect the presence of 2,4-D in samples taken from [Kleiss Farms].

9. The field sprayed by Bozdech is located northeast of [Kleiss Farms]. Weather data indicates that on April 23, 1998, when Bozdech sprayed his property the wind was from the north to northwest blowing away from [Kleiss Farms].

10. 2,4-D is commonly used in the area and was likely used by numerous other farmers in the area around the same time period that Bozdech sprayed.

11. There is no genuine issue of material fact as to whether defendant Bozdech was negligent or that he caused [Kleiss Farms'] injury by his alleged negligence, and Bozdech is entitled to judgment as a matter of law."

This appeal followed.

## II. ANALYSIS

### A. Summary Judgments and the Standard of Review

"The purpose of a summary judgment proceeding is not to try an issue of fact, but to determine whether any genuine issue of material fact exists." *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186, 766 N.E.2d 1118, 1123 (2002). Summary judgment is a " 'drastic means of disposing of litigation' " (*Happel*, 199 Ill. 2d at 186, 766 N.E.2d at 1123, quoting *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323, 1326 (1995)) and thus is only appropriate when the pleadings, depositions, and admissions, together with any affidavits, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law (*Happel*, 199 Ill. 2d at 186, 766 N.E.2d at 1123; 735 ILCS 5/2—1005(c) (West 1998)). We review *de novo* a trial court's grant of summary judgment, and in so doing, we construe facts strictly against the moving party and in a light most favorable to the nonmovant. *Happel*, 199 Ill. 2d at 185-86, 766 N.E.2d at 1123.

■ "The burden of proof and the initial burden of production in a motion for summary judgment lie with the movant." *Pecora v. County of Cook*, 323 Ill. App. 3d 917, 933, 752 N.E.2d 532, 545 (2001). A defendant who moves for summary judgment may meet its initial burden of production by either (1) affirmatively disproving the plaintiff's case by introducing evidence that, if uncontroverted, would

entitle the movant to judgment as a matter of law (the traditional test), or (2) by establishing that the nonmovant lacks sufficient evidence to prove an essential element of the cause of action (the *Celotex* test). *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682, 688, 737 N.E.2d 662, 668 (2000). A defendant does not meet its burden of production by merely asserting that the plaintiff lacks evidence. Rather, the defendant must show that the plaintiff cannot acquire sufficient evidence to make its case. See *Pecora*, 323 Ill. App. 3d at 934-35, 752 N.E.2d at 546 (concluding that the defendant failed to satisfy the burden of production and reversing summary judgment in the defendant's favor because although the defendant argued that sufficient evidence had not been presented, the defendant failed to suggest that adequate evidence could not be presented at trial); *Williams*, 316 Ill. App. 3d at 690, 737 N.E.2d at 669 (movant failed to carry its burden of production when it asserted that the plaintiff could not remember how she fell but failed to establish that the plaintiff could not produce an admissible expert opinion on the issues of breach of care and proximate cause). Only if the movant satisfies its initial burden of production does the burden shift to the plaintiff to present some factual basis that would arguably entitle him to a judgment under the applicable law. If the moving party fails to meet its burden of production, the party opposing summary judgment may rely solely upon the pleadings to create a question of material fact. *Williams*, 316 Ill. App. 3d at 689, 737 N.E.2d at 668. A party opposing summary judgment need not prove his case; rather he must provide some factual basis that would arguably entitle him to judgment. *Kane v. Motorola, Inc.*, 335 Ill. App. 3d 214, 224, 779 N.E.2d 302, 310 (2002).

## B. Proximate Cause

Kleiss Farms first argues that the trial court erred by granting Bozdech's summary judgment motion because a genuine issue of material fact exists as to whether Bozdech's spraying of 2,4-D caused Kleiss Farms' crop damage. We agree.

To sustain a negligence action, the plaintiff must prove that (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, and (3) the plaintiff's injury was proximately caused by the breach. *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 340, 798 N.E.2d 724, 728 (2003). Whether the defendant breached its duty to the plaintiff and whether the breach was the proximate cause of the plaintiff's injury are questions of fact. *Chandler*, 207 Ill. 2d at 340, 798 N.E.2d at 728.

■ The concept of "proximate cause" includes both "cause in fact" and "legal cause." *Donaldson v. Central Illinois Public Service*

*Co.*, 199 Ill. 2d 63, 90, 767 N.E.2d 314, 331 (2002). Although not expressly stated in Bozdech's summary judgment motion or appellate brief, the thrust of his argument appears to be that Kleiss lacks sufficient evidence of cause in fact. To establish cause in fact, the plaintiff is not required to produce "unequivocal or unqualified evidence of causation." *Donaldson*, 199 Ill. 2d at 91, 767 N.E.2d at 331. A plaintiff may meet the burden of causation with circumstantial evidence—that is, evidence from which a " 'jury may infer other connected facts which usually and reasonably follow according to *** common experience.' " *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 357, 603 N.E.2d 449, 456 (1992), quoting *Devine v. Delano*, 272 Ill. 166, 180, 111 N.E. 742, 748 (1916).

■ After reviewing the affidavits and depositions filed in this case in accordance with the standards and considerations set forth above, we conclude that (1) the trial court erred by weighing the evidence and granting summary judgment in favor of Bozdech (whose evidence the court found more persuasive); and (2) a genuine issue of material fact exists as to whether Bozdech's spraying of 2,4-D caused crop damage at Kleiss Farms.

In paragraph four of the trial court's judgment, the court found that the opinions of Bateman and Ries were based on their "observations" and that they did "not present scientific analysis or basis for their opinions." In paragraphs five and six, the court found that the opinions of Masiunas and Wilson were based on "reasoned analysis" and "scientific study." Thus, it appears that instead of determining whether the depositions and affidavits on file raised a genuine issue of material fact, the court considered which set of experts was more persuasive. At this point in the proceedings, the court should have considered only whether Bateman and Ries would be qualified to testify as experts at trial. The determination that their opinions were not as well supported by reasoned scientific analysis as the opinions of Masiunas and Wilson should have been left to the trier of fact. Notably, Bozdech did not (1) file a motion *in limine* seeking to bar Bateman or Ries's expert testimony or (2) challenge their qualifications to testify as expert witnesses at any other point in the proceedings. Moreover, even had he done so, no basis existed for determining that Bateman and Ries, given their background and training, would not be sufficiently qualified to testify as experts. See generally *Donaldson v. Central Illinois Public Service Co.*, 313 Ill. App. 3d 1061, 1076, 730 N.E.2d 68, 78 (2000) ("Expert testimony is admissible if the proffered expert is qualified as an expert by knowledge, skill, experience, training, or education and the testimony will assist the trier of fact in understanding the evidence").

The trial court further based its determination that no genuine issue of material fact existed as to proximate cause on its findings that (1) Masiunas opined that Bozdech's spraying on April 23, 1998, could not have caused the damage to Kleiss Farms; (2) the Department's laboratory analysis did not detect the presence of 2,4-D; (3) weather data indicated that on April 23, 1998, winds were blowing away from Kleiss Farms; and (4) 2,4-D was "likely" used by numerous other farmers in the area. These statements constitute findings of fact on disputed matters—findings that should be left to the trier of fact to make.

### 1. *Masiunas's Conclusion*

The trial court's finding that Masiunas "gave the opinion that Bozdech's spraying on April 23, 1998, could not have been the cause" of Kleiss Farms' crop damage is belied by Masiunas's deposition. Masiunas opined that a "possibility" existed that Bozdech's spraying of 2,4-D caused Kleiss Farms' crop damage. Thus, Masiunas's testimony does not satisfy Bozdech's burden to produce evidence that Kleiss Farms' cannot produce evidence of cause in fact.

### 2. *Laboratory Analysis*

Likewise, the Department's laboratory test results do not suggest that Kleiss Farms cannot produce sufficient evidence of 2,4-D damage caused by Bozdech. Masiunas, Ries, and Bateman testified that laboratory analysis for the presence of 2,4-D is not reliable. Bateman and Ries testified that they had each submitted plants for laboratory analysis and received negative results when they knew for a fact that the plants had been exposed to chemicals. Black testified that he could not say that 2,4-D was entirely absent from the Kleiss Farms sample. Foster, Ries, and Bateman testified based on their observations and experience that Kleiss Farms' crops had suffered 2,4-D damage. Masiunas testified that the damage was consistent with 2,4-D exposure although he believed that ultimately there were multiple causes. Although the laboratory test results were admissible evidence on the question of causation and arguably cut against Kleiss Farms' case, in light of the other evidence that 2,4-D damage occurred, the test results do not constitute evidence that Kleiss Farms could not prove at trial that 2,4-D damage occurred and was caused by Bozdech.

### 3. *Wind Data*

The trial court's finding that winds were blowing "away" from Kleiss Farms on April 23, 1998, is not fatal to Kleiss Farms' claim that Bozdech's spraying of 2,4-D on that date caused its crop damage. Although evidence showed that winds on April 23, 1998, were from

the north to northwest, Kleiss Farms' complaint alleged that Bozdech should have known that a danger of wind drift lasted for several days following 2,4-D's application. Moreover, the following evidence showed that the question of whether Bozdech's spraying of 2,4-D on April 23, 1998, caused Kleiss Farms' damage did not depend solely on the wind direction on that date: (1) Both Foster and Ries testified that vapor drift could occur two to three days after application of 2,4-D; and (2) Masiunas testified that he would expect drift damage to show within five days after application of the 2,4-D. Thus, to use wind-speed evidence to eliminate Bozdech's spraying of 2,4-D as a cause of Kleiss Farms' damage, Bozdech would have had to show that Kleiss Farms could not prove that the wind blew from his farm to Kleiss Farms at any time when spray drift or volatilization could have occurred between April 23, 1998, and approximately 12 hours before the damage first appeared on Kleiss Farms' crops on April 27, 1998.

### 4. *Use of 2,4-D by Other Farmers*

Finally, the trial court's finding that 2,4-D use by other area farmers during the same time period was "likely," does not constitute evidence that Kleiss Farms' could not prove cause in fact at trial. Although it was undisputed that herbicides were likely used by other farmers in the area during the same time period, no evidence was presented that any of Kleiss Farms' neighbors or other area farmers used 2,4-D in late April 1998. Moreover, Ries, Bateman, and Barry testified that they did not detect evidence of 2,4-D damage coming from any other location. We thus conclude that (1) Bozdech failed to meet his burden of production by showing that Kleiss Farms could not prove cause in fact at trial and (2) a genuine issue of material fact exists as to whether Bozdech's spraying of 2,4-D caused Kleiss Farms' crop damage.

### C. Breach of Duty

Kleiss Farms also argues that the trial court erred by granting Bozdech's summary judgment motion because a genuine issue of material fact exists as to whether Bozdech breached a duty of care. We agree.

As previously stated, whether a breach of duty occurred is generally a question of fact. *Chandler*, 207 Ill. 2d at 340, 798 N.E.2d at 728.

Apparently based on Bozdech's deposition and affidavit, the trial court found that (1) Bozdech followed the 2,4-D label instructions; (2) Bozdech used the 2,4-D in its intended manner; and (3) no evidence showed that Bozdech (a) sprayed when weather conditions were unfavorable, (b) did not use proper equipment, and (c) did not exercise reasonable care in the method of application. In this instance, we

again conclude that the trial court weighed the evidence rather than limiting its consideration to whether a question of material fact existed.

Bateman testified that there was no reason to use 2,4-D mixed with Roundup because Roundup kills all plants. Ries testified that 2,4-D could drift even when applied in accordance with its label instructions. Thus, Bozdech's averment that he applied the 2,4-D in accordance with the label instructions does not satisfy his burden of showing that Kleiss Farms cannot prove he breached a duty of care.

Moreover, Bozdech's summary judgment motion failed to produce evidence that Kleiss Farms could not prove negligent application of 2,4-D at trial. Wilson testified that (1) farmers have a duty to apply chemicals in such a way as not to cause damage to other farmers' crops; and (2) it would be a breach of that duty to fail to follow label instructions. Although Bozdech averred that he was familiar with 2,4-D label instructions, he testified that the premixed herbicide he bought from Illini FS did not come with a label. He also testified that when he applied the 2,4-D, he estimated the wind speed as being less than 10 miles per hour. Ries testified that 2,4-D should be applied when wind speeds are less than four miles per hour. Bateman testified that 2,4-D should not be sprayed when wind speeds are greater than five miles per hour. We thus conclude that a genuine issue of material fact existed as to whether Bozdech's application of 2,4-D was done in a negligent manner. Accordingly, we further conclude that the trial court erred by granting Bozdech's summary judgment motion.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

Reversed and remanded.

APPLETON, J., concurs.

JUSTICE COOK, dissenting:

I respectfully dissent and would affirm the decision of the trial court, granting defendant's motion for summary judgment.

The allegations in this case are unusual. Over the years, plaintiff has complained that farmers spraying herbicide have damaged his redbud trees, apple trees, and tomato plants. See *Kleiss v. Cassida*, 297 Ill. App. 3d 165, 696 N.E.2d 1271 (1998). On April 27, 1998, plaintiff observed possible herbicide damage to his tomato plants. Although plaintiff lives in a farming area, "a fog of chemicals," according to a

pesticide specialist with the Illinois Department of Agriculture, plaintiff picked out defendant's farm, $1^3/4$ miles away, as the source of his problem. Plaintiff did that by driving around until he saw a farm (defendant's farm) where weeds had been "damaged." Plaintiff alleges that defendant's spraying of 2,4-D on or about April 23, 1998, was negligent and caused the damage to plaintiff's crops.

While summary judgment has been called a drastic measure, it is an appropriate tool to employ in the expeditious disposition of a lawsuit in which the right of the moving party is clear and free from doubt. *Robertson v. Sky Chefs, Inc.*, 344 Ill. App. 3d 196, 199, 799 N.E.2d 852, 855 (2003); *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871 (1986). If a party moving for summary judgment supplies facts that, if not contradicted, would entitle such party to a judgment as a matter of law, the opposing party cannot rely on his pleadings alone to raise issues of material fact. Thus, facts contained in an affidavit in support of a motion for summary judgment that are not contradicted by counteraffidavit are admitted and must be taken as true for purposes of the motion. *Purtill*, 111 Ill. 2d at 240-41, 489 N.E.2d at 871-72.

As the trial court stated in its order, defendant's expert (Wilson) gave the opinion that Bozdech's spraying could not have caused the damage. Plaintiff's own expert (Masiunas) had the same opinion. Masiunas testified that defendant had applied low-volatile 2,4-D, that volatilization was only a problem above 95 degrees, that the highest temperature in the area between April 23 and May 5 was 77 degrees. Masiunas testified the tomato injuries could not have been caused by spray drift, that the wind was mostly out of the west during the relevant period. Foster, the Illinois Department of Agriculture specialist, could not say that defendant's spraying caused plaintiff's damage. Foster took samples of the most severely damaged tomatoes, but laboratory tests detected no 2,4-D. The Department of Agriculture refused to send a warning letter to defendant. Wilson had never seen spray drift more than 3,000 to 3,500 feet; Foster had never seen herbicide drift cause damage beyond one mile.

At oral argument, plaintiff's attorney stated that plaintiff had two friends, Ries and Bateman, who were allowed to pick vegetables on plaintiff's farm. Ries, a retired professor in environmental sciences and crop sciences, testified he was certain, to a reasonable degree of professional certainty, that defendant's field was the source of plaintiff's 2,4-D damage. Ries did not explain his conclusion. Ries had never seen spray drift occur more than "a couple of hundred yards." Ries testified that 2,4-D travels via volatile drift and that volatilization drift can exceed $1^1/2$ miles where the temperature is above 85 degrees

with a 20 mile-per-hour wind. Ries was unaware of the weather conditions when defendant sprayed his field and had no opinion as to whether defendant did anything improper in applying the chemicals.

Bateman is a retired extension adviser who worked as a paid consultant for plaintiff from 1991 until 1998. Based upon his experience in the 1950s, Bateman opined that 2,4-D could drift $1^{1}/_{2}$ miles. Bateman acknowledged that the 2,4-D used in the 1950s is not the same as the low-volatile 2,4-D used today. Bateman testified that 2,4-D could drift $1^{1}/_{2}$ miles with a wind speed of five miles per hour. Bateman did not base that upon any studies he or others had conducted, but upon the warning on the label, which advises a user not to spray unless the wind speed is lower than that. Bateman did not know the weather conditions during the appropriate time but testified that based upon a reasonable degree of scientific certainty, defendant's spraying was the source of plaintiff's damage. Bateman did not explain his conclusion. Bateman testified that 2,4-D damage was clearly identifiable but later testified that Banvel or Dicamba damage would be similar.

The trial court correctly concluded that plaintiff's experts, Ries and Bateman, did not present a scientific analysis or basis for their opinions. An expert opinion is only as valid as the reasons for the opinion. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 299, 775 N.E.2d 964, 987 (2002). When an expert testifies simply that plaintiff should win but is unable to support that conclusion with reasoned analysis, the expert's testimony is worthless, provides no assistance to the jury, and should be stricken. *Kleiss*, 297 Ill. App. 3d at 174, 696 N.E.2d. at 1277 (referring to previous testimony of Bateman). There is no genuine issue of a material fact in this case. Plaintiff's affidavits did not contradict the facts supplied by defendant. Plaintiff should not be allowed to get his case to a jury by standing on his pleadings.

Assuming that plaintiff's damage was caused by 2,4-D, how was it possible to pick out defendant's farm, $1^{3}/_{4}$ miles away, as the source of that damage? Foster testified that plaintiffs' farm was in a "fog of chemicals out there" and it was hard to pinpoint where they may have come from. Ries testified to the increased use of chemicals with no-till farming and acknowledged that it was possible that a farm located between plaintiff's and defendant's farms could have applied a herbicide spray. Plaintiff testified he was able to follow the pattern of damage all the way back to his farm, but there was no testimony what herbicides were applied by the intervening farms during this period. All the testimony was that defendant applied his herbicide properly, in the manner directed by the manufacturer. There was no testimony what herbicides were applied on the farms surrounding plaintiff.

How can plaintiff ever prevail in a case like this? How can plaintiff establish that defendant's 2,4-D caused his damage when he lives in an area described as "a fog of chemicals?" Laboratory tests cannot tie defendant's herbicide to plaintiff's damage; in fact, laboratory tests here cannot even establish that plaintiff suffered 2,4-D damage. Summary judgment is appropriate here because plaintiff lacks sufficient evidence to prove an essential element of his cause of action. *Williams*, 316 Ill. App. 3d at 688, 737 N.E.2d at 668 (*Celotex* test). There is another reason why summary judgment is appropriate here. Even if some issue of fact is presented by a motion for summary judgment, if what is contained in the pleadings and affidavits would have constituted all of the evidence before the court at trial and upon such evidence nothing would be left to go to a jury, and the court would be required to direct a verdict, then a summary judgment should be entered. *Fooden v. Board of Governors of State Colleges & Universities of Illinois*, 48 Ill. 2d 580, 587, 272 N.E.2d 497, 500 (1971); *Koziol v. Hayden*, 309 Ill. App. 3d 472, 477, 723 N.E.2d 321, 324-25 (1999). That is the situation here.

Whether a duty exists in a particular case is a question of law to be determined by the court. Among the factors to be considered in determining whether a duty should be imposed are the magnitude of the burden of guarding against such injury and the consequences of placing that burden on the defendant. *Happel*, 199 Ill. 2d at 186-87, 766 N.E.2d at 1123-24. The majority characterizes plaintiff's complaint as sounding in absolute liability: if defendant (or anyone else) applies a herbicide, and the herbicide causes damage to plaintiff, defendant is liable even though defendant followed all recommended precautions. Such a rule would impose a severe burden on farmers and have extensive consequences. We should not impose such a duty.