# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Estate of Koester*, 2012 IL App (4th) 110879

---

| | |
|---|---|
| Appellate Court Caption | In re: the Estate of MAURICE J. KOESTER, Deceased, LARRY KOESTER and GERARD KOESTER, Petitioners-Appellants, v. FIRST MID-ILLINOIS BANK & TRUST, N.A., Mattoon, Illinois, As Successor Administrator of the Estate of PATRICIA A. KOESTER, Deceased; and MICHAEL J. METZGER. as Successor Independent Administrator of the Estate of MAURICE J. KOESTER, Deceased, Respondents-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-11-0879 |
| Argued | May 15, 2012 |
| Filed | June 15, 2012 |
| Rehearing denied | July 13, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Allegation that testator burned a duplicate original of his will did not warrant trial court's conclusion that testator thereby revoked copy of will filed with court pursuant to petition seeking admission of that will to probate where there was no evidence testator executed duplicate wills, as opposed to only one will, or that the will filed with the court was out of the testator's possession so as to prevent him from revoking that copy by "burning, cancelling, tearing or obliterating it"; therefore, the trial court's denial of the petition to admit the will to probate was reversed. |
| Decision Under Review | Appeal from the Circuit Court of Coles County, No. 10-P-11; the Hon. Mitchell K. Shick, Judge, presiding. |

| | |
|---|---|
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Glenn A. Braden, of Braden Law Office, of Neoga, and K. Rick Keller (argued), of Keller & Runde, of Effingham, for appellants. |
| | R. Sean Hocking, of Craig & Craig, of Mattoon, for appellee First Mid-Illinois Bank & Trust, N.A. |
| | William A. Sunderman (argued) and Madison Mullady, both of Brainard Law Offices, of Charleston, for appellee Michael J. Metzger. |
| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion. Justices Steigmann and Knecht concurred in the judgment and opinion. |

**OPINION**

¶ 1    The petitioners in this case are Larry Koester and Gerard Koester. The decedent, Maurice J. Koester, named them as coexecutors in his will, dated December 5, 1980.

¶ 2    The respondents are First Mid-Illinois Bank & Trust, N.A., and Michael J. Metzger. The bank is the administrator of Maurice's estate (letters of administration were issued before his purported will came to light). Metzger is the executor of Patricia A. Koester's will. Patricia was Maurice's wife. She died several months after him.

¶ 3    Petitioners filed a petition to admit Maurice's will to probate. Respondents objected to the petition, alleging that Maurice had burned a duplicate original of his will of December 5, 1980, thereby revoking the duplicate original now on file with the Coles County circuit clerk. Respondents relied on *In re Estate of Holmberg*, 400 Ill. 366 (1948), for their theory that, by destroying one of two duplicate original wills, Maurice revoked both of them. At the conclusion of an evidentiary hearing, the trial court agreed with respondents' theory of revocation and consequently denied admission of the will to probate. Petitioners appeal.

¶ 4    Reviewing the record with a deferential eye, we do not find any actual evidence that Maurice executed duplicate wills on December 5, 1980, as opposed to only one will, the will on file with the circuit clerk. Ultimately, one can only speculate that he did so–and speculation is not evidence.

¶ 5    In any event, even if Maurice did execute duplicate wills on December 5, 1980, one of which he afterward burned, respondents presented no evidence that the surviving duplicate original–the one that petitioners wish to be admitted to probate–was out of Maurice's

possession at his death so as to prevent him from revoking that one as well by "burning, cancelling, tearing or obliterating it." 755 ILCS 5/4-7(a)(1) (West 2010). In that respect, *Holmberg* is distinguishable, for the supreme court held in *Holmberg* that "cancellation by a testator of one of two duplicate originals of his will cancels and revokes the other duplicate original *left in the custody of another person*." (Emphasis added.) *Holmberg*, 400 Ill. at 370. We see no evidence that the surviving duplicate original remained in someone else's custody so as to make its continued existence explainable.

¶ 6    For these reasons, we conclude that the trial court's judgment is against the manifest weight of the evidence, and we reverse the judgment and remand this case for further proceedings.

¶ 7                                    I. BACKGROUND
¶ 8                    A. Events and Procedures Leading up to the Bench Trial
¶ 9    On December 5, 1980, Maurice executed a will, in which he gave all his personal property to his parents and the residue of his estate to a testamentary trust for the benefit of his parents and siblings. Upon the death of Maurice's last-surviving parent, the trust was to terminate, and its assets were to be distributed to the descendants of Maurice's parents. The will named petitioners as cotrustees and coexecutors. They both are brothers of Maurice.

¶ 10    In June 1982, Maurice married Patricia.

¶ 11    On January 27, 2010, Maurice died. His wife, Patricia, survived him.

¶ 12    On February 3, 2010, Patricia filed a petition to be appointed independent administrator of Maurice's estate. In her petition, she alleged that Maurice had left no will. That same day, the trial court appointed her as independent administrator of Maurice's estate.

¶ 13    On June 21, 2010, Patricia resigned her position as independent administrator–"as a result of issues relating to [her] health," her resignation said–and she designated Metzger to be the successor independent administrator. That same day, the trial court appointed Metzger as the successor administrator.

¶ 14    In July 2010, Maurice's will of December 5, 1980, was mailed anonymously to the trial court. It is an original signed will. None of the parties dispute the authenticity of the will, although it is unknown where the will came from.

¶ 15    On October 21, 2010, petitioners filed a petition to admit the will to probate and for the issuance of letters testamentary.

¶ 16    On October 28, 2010, Patricia died.

¶ 17    On November 3, 2010, Metzger resigned his position as the successor independent administrator of Maurice's estate. The stated reason for his resignation was that he was named as executor in Patricia's will and he believed that his responsibilities as her executor conflicted with his responsibilities as administrator of Maurice's estate. He recommended First Mid-Illinois Bank & Trust, N.A., to replace him as administrator. On December 1, 2010, the trial court appointed the bank as the successor independent administrator of Maurice's estate.

¶ 18    On December 13, 2010, Metzger, in his capacity as executor of Patricia's will, filed

objections to the petition to admit Maurice's will to probate. Metzger alleged that Maurice revoked the will sometime after marrying Patricia.

¶ 19    On December 22, 2010, the bank, as the independent administrator of Maurice's estate, likewise filed objections to the petition to admit the will to probate. On information and belief, the bank likewise alleged that Maurice revoked the will sometime after marrying Patricia.

¶ 20                                 B. The Bench Trial

¶ 21                                 1. *Respondents' Case*

¶ 22    On June 1, 2011, the trial court held a bench trial on the objections to the petition to admit Maurice's will to probate. At the beginning of the trial, respondents' attorneys acknowledged to the court that they had the burden of proving that Maurice had revoked his will. They said that, to carry their burden, they would present the live testimony of Virginia Hayes as well as the evidentiary deposition of Robert E. Cummins.

¶ 23                                 a. Virginia Hayes

¶ 24    Virginia Hayes, a longtime resident of Westfield, testified she became acquainted with Patricia in 1970 from working with her at Moore Business Forms and that they became good friends, as close as sisters. Hayes met Maurice when he was dating Patricia, and Hayes became close to him as well, as if he were a brother. After Maurice and Patricia married in June 1982, Hayes visited them probably three times a week, usually in their home.

¶ 25    Patricia, who previously lived in town, moved in with Maurice on his farm after marrying him. Patricia knew nothing about farming, but Maurice was a farmer by trade. Because Hayes had been raised on a farm, she asked Maurice questions about farming, and he asked her questions about insurance, a topic in which she had occupational experience.

¶ 26    Hayes described Maurice as "[v]ery well read. He took a lot of newspapers, a lot of magazines. He was very up to date on a lot of subjects." He even knew a thing or two about the probate of wills. He "appear[ed] to have an understanding of the probate process and what was involved." When Hayes's father died, the probate proceedings were "a long process[,] and Maurice and [Hayes] discussed that also."

¶ 27    One winter evening, toward sunset–Hayes could not remember the year, but it was after Maurice and Patricia married–Maurice, Patricia, and Hayes were sitting at the kitchen table in the Koester residence. Maurice got up from the table, went into his office, and returned with a document that he said was his will. Other than the words "Last Will and Testament of Maurice J. Koester" or words to that effect, Hayes did not read the document.

¶ 28    At trial, Metzger's attorney handed Hayes Maurice's will of December 5, 1980, which had been filed anonymously with the trial court and which petitioners were seeking to have admitted to probate. For the record, the attorney described the will as being "on 8 1/2 x 14 inch bond paper with a white back on it at the top marked [']Kidwell, Cummins and Bast[']." Hayes agreed with this description of the document that the attorney had handed her. "Cosmetically," the document "look[ed] exactly the same" as the document Maurice brought

out of his office that winter evening. Both documents had "a white back" and "this crinkly paper." "From a content standpoint," however, Hayes did not "have a clue" whether the two documents were the same. Other than the words at the top, "Last Will and Testament," she did not read the document that Maurice brought out of his office; nor did Maurice read the document to her. Instead, he sat down again at the kitchen table, picked up Patricia's cigarette lighter, and set fire to the document. Then he stood up from the table and went to the door, taking the flaming document with him, and he opened the door and threw the document onto the snowy ground outside, where it burnt to ashes. He told Patricia, " 'Sell everything. Move to town. There's not enough here for two families' "–something Hayes had heard him say "probably three different times at least."

¶ 29    It did not surprise Hayes that Maurice would say this to Patricia, because Patricia was a "city girl" who "knew very little about farming" and if she had rented out the farm after Maurice's death, the rental income would not have "be[en] a very good living for her," as Hayes knew from her conversations with Maurice. The renter would not have made a very good living, either.

¶ 30    One of Maurice's brothers, Gerard J. Koester, worked for Maurice on the farm. More than once, in Maurice's final years, Hayes heard Maurice remark, " [']I'll help [Gerry] while I'm alive and then he's on his own.['] "

¶ 31    Other than that remark, Hayes never heard Maurice discuss any of his siblings. Other than Gerard, she never saw any them at Maurice's house.

¶ 32    Although Hayes knew that Patricia had left two surviving adult children, Hayes was unacquainted with them. She neither knew nor cared whether Maurice's estate would go to them if his will were invalidated.


¶ 33                    b. The Evidentiary Deposition of Robert E. Cummins

¶ 34    Robert E. Cummins, who was retired, testified that his first job after graduating from law school in 1972 was as an associate attorney in the law firm of William K. Kidwell in Mattoon. After working for Kidwell for a year or two, Cummins became the public defender in Coles and Cumberland Counties. Then, in 1974, he resigned his position as public defender and formed a partnership with Kidwell. The partnership lasted until Kidwell's death.

¶ 35    Kidwell was not only a partner to Cummins but also was his mentor. During his association and partnership with Kidwell, Cummins "learn[ed] the practice and procedures that Mr. Kidwell used in his office with respect to preparation and execution of wills." He "sat in with [Kidwell] when wills were executed and for quite some time *** used the same procedure."

¶ 36    Kidwell's *modus operandi* was to prepare duplicate wills for the client's execution. Cummins testified: "When he [*sic*] executed the will, he kept the original in his safe and also had the testator sign a duplicate original which he handed to them."

¶ 37    When Cummins first started working with Kidwell, there was a clear distinction between originals and copies. "Copies were generally carbon copies[,] and they were on onion skin

paper." This changed in the late 1970s or early 1980s, when the firm acquired word processing equipment; executed copies henceforth were undistinguishable from originals.

¶ 38 After forming the partnership with Kidwell, Cummins "pretty much did [his] own practice and *** didn't go in and watch [Kidwell] execute wills, although occasionally [Cummins] might have acted as witness." He was "confident," though, that Kidwell continued to follow the same procedure with respect to wills.

¶ 39 Cummins had no recollection of Maurice Koester or his will. "Mr. Koester was not a client of mine," he testified, "other than he may have come in because he was a client of Mr.– had been a client of Mr. Kidwell's and Mr. Kidwell wasn't available, so I might have helped him."

¶ 40 Although Cummins had no memory of Maurice or his will, he recognized the names of the two persons who had signed Maurice's will as attesting witnesses. One witness, Irma J. Kidwell, was William K. Kidwell's wife. She had worked at the firm for a long time as bookkeeper, office manager, and receptionist. The other witness, Kathy J. Duncan, was not an employee but a client. It was customary at the firm to ask clients if they would be willing to witness the execution of wills.

¶ 41 *2. Petitioners' Case*

¶ 42 Petitioners requested the trial court to take judicial notice of a certified copy of William K. Kidwell's medical certificate of death. According to the certificate, Kidwell died on February 18, 1979, a year and nine months before Maurice executed his will of December 5, 1980.

¶ 43 II. ANALYSIS

¶ 44 A. Our Standard of Review

¶ 45 Petitioners contend that we should review this case *de novo* because "neither the facts nor the credibility of witnesses is questioned." See *People v. Abney*, 81 Ill. 2d 159, 168 (1980). On the contrary, even though petitioners do not dispute the truth of the witnesses' testimony–even though they do not dispute Hayes's testimony, for example, that Maurice burned a document bearing the words "Last Will and Testament of Maurice J. Koester"–they dispute the inference that the trial court drew from the evidence, namely, that the document that Maurice burned was a duplicate original of his will of December 5, 1980. If divergent inferences can be drawn from undisputed facts, the reviewing court will defer to the inference the trier of fact drew (*Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44 (1987)), provided that the inference is reasonable (*Bridgestone/Firestone, Inc. v. Doherty*, 305 Ill. App. 3d 141, 147 (1999)) or, in other words, not against the manifest weight of the evidence (*In re Estate of Minsky*, 46 Ill. App. 3d 394, 400 (1977)).

¶ 46 So, contrary to petitioners' contention, we should not review *de novo* the issue of whether Maurice burned a duplicate original of his will of December 5, 1980. Instead, we should defer to the trial court's inference that Maurice did so, unless that inference is against the manifest weight of the evidence. See *Minsky*, 46 Ill. App. 3d at 400. The trial court's

judgment is against the manifest weight of the evidence only if it is "clearly apparent," from the record of the bench trial, that respondents failed to prove all the facts essential to a revocation of the will of December 5, 1980. See *DeLong v. Cabinet Wholesalers, Inc.*, 196 Ill. App. 3d 974, 978 (1990).

¶ 47　　As petitioners correctly say, to the extent we must interpret any provision of the Probate Act of 1975 (Probate Act) (755 ILCS 5/1-1 to 30-3 (West 2010)), we do so *de novo*. *In re Estate of Poole*, 207 Ill. 2d 393, 401 (2003). It follows that we independently determine what is legally necessary to revoke a will.

¶ 48　　　　　　B. Is There Any Evidence That the Document That Maurice Burned

Was a Duplicate Original of His Will of December 5, 1980?

¶ 49　　Petitioners argue: "[T]here was no evidence presented to show that the 'will' burned by Maurice J. Koester was a duplicate original of the December 5, 1980 Will that sits in the office of the Coles County Circuit Clerk, awaiting probate." Before considering that argument, we will discuss the legal significance of (1) burning a will and (2) burning the duplicate original of a will.

¶ 50　　As for burning a will, section 4-7(a)(1) of the Probate Act (755 ILCS 5/4-7(a)(1) (West 2010)) provides that a will may be revoked "by burning, cancelling, tearing or obliterating it by the testator himself or by some person in his presence and by his direction and consent." Of course, an accidental destruction of the will does not count. In order for the destruction of the will to be a revocation of the will, the testator had to intend to revoke it by destroying it. *Gorrell v. Boyd*, 376 Ill. 132, 137 (1941).

¶ 51　　A presumption of revocation arises if the will cannot be found at the testator's death. If the testator retains the will after executing it and if the will cannot be found among the testator personal effects after the testator dies, the presumption is that the testator destroyed the will–burned it, tore it up, or otherwise obliterated it–with the intention of revoking it. *In re Estate of Moos*, 414 Ill. 54, 57 (1953); *Griffith v. Higinbotom*, 262 Ill. 126, 130 (1914); *In re Estate of Koziol*, 366 Ill. App. 3d 171, 177 (2006).

¶ 52　　But what if the testator executed two identical wills, only one of which can be found after the testator's death? If the surviving duplicate original is in the hands of someone else, the presumption again arises that the testator revoked the will, because the duplicate original that the testator retained cannot be found and the testator did not possess the other duplicate original so as to be able to destroy it. *Holmberg*, 400 Ill. at 371. Thus, "where a testator intentionally destroys, or is presumed to have destroyed *animo revocandi* [(with the intent of revocation)], the copy of his duplicate will retained in his possession, in the absence of proof to the contrary, that copy and the duplicate in another's hand will be held revoked." (Internal quotation marks omitted.) *Id.*

¶ 53　　With those legal principles in mind, we turn to the question, did the trial court make a finding that was against the manifest weight of the evidence when it found that Maurice burned a duplicate original of his will sometime after he married Patricia? Let us begin by stating our difficulty with that finding. On the one hand, something very tangible and very real is on file with the Coles County circuit clerk: an authentic, original will duly signed by

Maurice and two attesting witnesses on December 5, 1980. As the court held, this will is *prima facie* admissible to probate. See 755 ILCS 5/6-4(a) (West 2010); *In re Estate of Ragen*, 96 Ill. App. 3d 1035, 1041 (1981).

¶ 54 On the other hand, as against this physically existent will, the authenticity of which respondents do not dispute, there is Hayes's testimony that, sometime after marrying Patricia, Maurice burned a document that he said was his will and which was entitled "Last Will and Testament." Hayes never had an opportunity to read any part of this document other than its title. *Cf. In re Robinson's Will*, 13 N.Y.S.2d 324, 326 (N.Y. App. Div. 1939) ("But the court cannot determine whether the two wills are identical unless both are produced. "), *cited in Holmberg*, 400 Ill. at 370, 371. Her description of the will as having a "white backing" and "crinkly paper" is rather nondescript. Even so, the trial court inferred, from "circumstantial evidence," that the document Maurice burned was a duplicate original of his will of December 5, 1980.

¶ 55 Essentially, this circumstantial evidence was as follows: (1) the will of December 5, 1980, had been drafted at the firm of Kidwell, Cummins, and Bast, and Cummins had adopted Kidwell's practice of preparing duplicate wills for execution by the client; (2) Maurice had told Patricia to sell the farm when he died because the farm was not a large enough asset for two families (by which he evidently meant his own family and Patricia's family); and (3) Maurice had said that his assistance of Gerard would end when Maurice died.

¶ 56 Granted, propositions (2) and (3) can serve as evidence that Maurice intended to revoke his will of December 5, 1980, considering that the continued existence of that will would have been inconsistent with his stated objectives. But intentions can be fickle, and for that reason, section 4-7(a) of the Probate Act (755 ILCS 5/4-7(a) (West 2010)) requires more than a revocatory intent; it requires that, while having such an intent, the testator perform one of the acts described in section 4-7(a) (*Dowling v. Gilliland*, 286 Ill. 530, 535 (1919)), such as burning the will–in this case, not just any will but the will of December 5, 1980. The will of December 5, 1980, still exists, unburned, in the files of the circuit clerk–a state of affairs seemingly inconsistent with the claim that Maurice burned it.

¶ 57 Respondents attempt to explain away the continued physical existence of the will by theorizing that Cummins prepared duplicates of the will for Maurice's signature; and the trial court was persuaded by this theory. Cummins, however, had no recollection of either Maurice or his will, and there was no evidence that Cummins actually did prepare Maurice's will of December 5, 1980. Cummins never testified he was the only attorney left in the firm after Kidwell's death in 1979. What about Bast, for example? The law firm was named after three partners, including Bast, and there was no evidence that Bast had adopted Kidwell's practice of preparing duplicate original wills. Cummins never suggested that the preparation of duplicate wills was an office-wide procedure. Not all lawyers agree that the execution of duplicate wills is a wise idea. Restatement (Third) of Prop.: Wills and Other Donative Transfers § 4.1, Reporter's Note 5, at 280 (1999) ("Leading writers on wills preach against duplicate execution."). One can only speculate that Cummins drafted Maurice's will of December 5, 1980, and consequently one can only speculate that duplicate original wills were prepared for Maurice's execution. Cummins's testimony means nothing unless he did

in fact prepare Maurice's will, and there is no evidence that he did so.

¶ 58 In *Holmberg*, by contrast, there was positive proof of duplicate original wills: the testator's friend had possession of the executed ribbon copy, which he filed in probate court, and the executed carbon copy (with "Void" written across it by the testator) was found in the testator's pocketbook after she died. *Holmberg*, 400 Ill. at 367-68. Thus, *Holmberg* is distinguishable from the present case, in which the preparation and execution of duplicate original wills is merely a matter of speculation.

¶ 59 This is not to deny the validity of circumstantial evidence, which consists of reasonable inferences from known facts (see *Kleiss v. Bozdech*, 349 Ill. App. 3d 336, 341-43 (2004)). The inferences, however, must be reasonable; they cannot be mere guesswork; they cannot rest upon the void. That Cummins, as opposed to some other attorney in the firm, prepared Maurice's will is nothing but a guess. That duplicate original wills were prepared for Maurice's signature is nothing but a guess. The trial court practically admitted as much when it said: "There's no clear evidence that [the will Maurice burned] was the duplicate original or the original, or some other will that I've not heard any testimony about."

¶ 60 Evidently, at some point in time, Maurice executed some other will, because after he burned that will, the will of December 5, 1980, still exists. Given the lack of evidence of a duplicate original, one can only regard the will on file and the will he burned as different wills.

¶ 61 It might be argued, though, that if we regarded them as different wills instead of duplicate originals, Maurice's act of burning one will, while leaving his will of December 5, 1980, in force, would have made no sense, given his stated goals of enabling Patricia to sell the farm after he died and discontinuing his help to Gerard. But, again, this argument is merely another way of saying there was evidence of a revocatory intent. "A mere intention to revoke a will is not sufficient, but the intention to revoke must be accompanied by some one of the acts provided by the statute." *Noesen v. Erkenswick*, 298 Ill. 231, 234 (1921). One of those acts is burning the will (755 ILCS 5/4-7(a) (West 2010)), and given the continued existence of the will of December 5, 1980, in the files of the circuit clerk, one can find that Maurice revoked that will only by speculating that he executed a duplicate, which he afterward burned (never mind the enigma of how the surviving duplicate original escaped from the safe of Kidwell, Cummins, and Bast so as to make its anonymous journey to the circuit clerk). Because "such conjecture is no substitute for proof" (*In re Twenty-Seven Thousand Four Hundred Forty Dollars*, 164 Ill. App. 3d 44, 47 (1987)), it is "clearly apparent" that respondents failed to prove the execution of duplicate originals of the will of December 5, 1980. *DeLong*, 196 Ill. App. 3d at 978.

¶ 62 2. *Assuming That Maurice Executed Duplicate Original Wills and Burned One of Them, Did He Thereby Revoke the Other?*

¶ 63 If we were to assume, for the sake of argument, that Maurice did execute duplicate original wills on December 5, 1980, and that he burned one of them sometime after marrying Patricia, *Holmberg* is distinguishable in that the surviving duplicate original in that case was in the hands of someone other than the testator when she died. *Holmberg*, 400 Ill. at 367. The

-9-

supreme court held that "the cancellation by a testator of one of two duplicate originals of his will cancels and revokes the other duplicate original *left in the custody of another person*." (Emphasis added.) *Id.* at 370.

¶ 64        The friend's possession of the surviving duplicate original was important in *Holmberg* because the survival of that duplicate original was explainable by the testator's not having possession of it at the time of, and after, her cancellation of the duplicate original in her possession. See *In re Mittelstaedt's Will*, 112 N.Y.S.2d 166, 169 (N.Y. App. Div. 1952). Under the common law, a "testator [could] destroy his will by destroying the one in his possession without *repossessing* and destroying its duplicate." (Emphasis added.) *Robinson's Will*, 13 N.Y.S.2d at 326. The Supreme Court of Illinois interpreted section 4-7(a) (or, more precisely, the identical predecessor provision (Ill. Rev. Stat. 1947, ch. 3, ¶ 197(a)) as incorporating that principle of common law: to revoke a will, it was necessary only that the testator burn, cancel, tear, or obliterate the duplicate original in his or her possession. *Holmberg*, 400 Ill. at 369.

¶ 65        Otherwise, we should follow the explicit text of section 4-7(a) (755 ILCS 5/4-7(a)(1) (West 2010)). The statute says: "A will may be revoked only (1) by burning, cancelling, tearing or obliterating it by the testator himself or by some person in his presence and by his direction and consent ***." 755 ILCS 5/4-7(a)(1) (West 2010). (Section 4-7(a) lists additional methods of revocation in subsections (2), (3), and (4) (755 ILCS 5/4-7(a)(2), (a)(3), (a)(4) (West 2010)).)

¶ 66        There seems little doubt that if the testator executed two substantively different wills on two separate days and if neither will revoked the other or was inconsistent with the other, section 4-7(a)(1) would require the testator to cancel or obliterate them both in order to revoke them both. But what if the testator executed two duplicate originals on the same day–are they one "will" within the meaning of section 4-7(a)(1), such that the revocation of one document is the revocation of the other, no matter where the other is; or are they two "wills"?

¶ 67        The Probate Act does not define the term "will" other than to say it "includes testament and codicil" (755 ILCS 5/1-2.18 (West 2010)). Therefore, we assume the legislature adopted the settled definition that the term had in the common law. See *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 403 (2005). The supreme court has defined a "will" as "*an instrument* by which a person makes a disposition of his property to take effect after his death." (Emphasis added.) *Austin v. First Trust & Savings Bank*, 343 Ill. 406, 412-13 (1931). See also *Noble v. Fickes*, 230 Ill. 594, 600 (1907). Because each of two duplicate originals is such an "instrument," each duplicate original is a "will" in its own right, within the meaning of section 4-7(a) (755 ILCS 5/4-7(a) (West 2010)). It follows that if a testator has possession of both duplicate original *wills* and burns only one of them, the surviving duplicate original will has not been revoked, according to section 4-7(a)(1), because section 4-7(a)(1) provides that "[a] will may be revoked only *** by burning, cancelling, tearing or obliterating it." 755 ILCS 5/4-7(a)(1) (West 2010). Unless one of the duplicate originals is in someone else's possession (*Holmberg*, 400 Ill. at 372), the burning of one does not revoke the unburnt, untorn, uncancelled, unobliterated other one. If a testator executes two duplicate original wills–two instruments–and burns one of them but the other is found unscathed

among the testator's personal effects, the testator has not revoked that surviving duplicate original will, because, as to that will (which is a will in its own right), the testator has not complied with section 4-7(a)–although the testator could have done so.

¶ 68 Assuming, again, that the will on file with the Coles County circuit clerk is a duplicate original, the counterpart of the one that Maurice burned, it is unknown who had possession of this surviving duplicate original at the time of Maurice's death. Under sections 6-4 and 8-1(c) of the Probate Act (755 ILCS 5/6-4, 8-1(c) (West 2010)), respondents had the burden of proving it was *not* in Maurice's possession when he died. Petitioners did not have the burden of accounting for the will's whereabouts. Section 6-4, by its terms, does not require the proponent of the will to prove who had possession of it when the testator died. Instead, all section 6-4(a) requires the proponent to do is produce a statement by two attesting witnesses to the execution of the will. Each witness must state that "(1) he was present and saw the testator or some person in his presence and by his direction sign the will in the presence of the witness or the testator acknowledged it to the witness as his act, (2) the will was attested by the witness in the presence of the testator and (3) he believed the testator to be of sound mind and memory at the time of signing or acknowledging the will." 755 ILCS 5/6-4(a) (West 2010). Once the proponent presents the statement by the two attesting witnesses, "the execution of the will is sufficiently proved to admit it to probate, unless there is proof of fraud, forgery, compulsion or other improper conduct which in the opinion of the court is deemed sufficient to invalidate or destroy the will." *Id.*

¶ 69 The will in this case contains an attestation clause, the sufficiency of which respondents do not appear to dispute (see 755 ILCS 5/6-4(b)(2) (West 2010) ("The statements of a witness to prove the will under subsection 6-4(a) may be made by *** an attestation clause signed by the witness and forming a part of or attached to the will ***.")), and there appears to be no evidence of fraud, forgery, compulsion, or other improper conduct. Consequently, the proponents of Maurice's will, the petitioners, made out a "*prima facie* case entitling the will to probate." *In re Estate of Walsh*, 400 Ill. 454, 457 (1948); *In re Estate of Weaver*, 50 Ill. App. 3d 223, 227 (1977).

¶ 70 As a matter of correct procedure, the trial court should have admitted Maurice's will to probate, given the court 's finding that petitioners had made out a *prima facie* case under section 6-4 (755 ILCS 5/6-4 (West 2010)). See *In re Estate of Nicola*, 275 Ill. App. 3d 497, 499 (1995) ("If the elements of [section 6-4(a)] are proved, then the will must be admitted to probate. [Citation.] The proponent of a will need not prove that the will is valid in all respects in order to have the will admitted to probate. [Citation.]"). Then, within six months after the admission of the will to probate, any interested person could have filed a petition contesting the validity of the will. See 755 ILCS 5/8-1(a) (West 2010). See also *Sternberg v. St. Louis Union Trust Co.*, 394 Ill. 452, 459 (1946) ("A will after it has been admitted to probate may be contested on any grounds including its revocation."); *In re Estate of Moerschel*, 86 Ill. App. 3d 482, 485 (1980) (an allegation that a will had been revoked is a will contest within the meaning of section 8-1). In the evidentiary hearing on the petition to contest the validity of the will, "[t]he contestant shall in the first instance proceed with proof to establish the invalidity of the will." 755 ILCS 5/8-1(c) (West 2010). To prove the invalidity of Maurice's will under *Holmberg*, respondents had the burden of proving that the

surviving duplicate original will was in the possession of someone other than Maurice when he died so as to prevent him from burning that one, too. Respondents presented no evidence at all on that issue. It simply is unknown where the surviving duplicate original came from. As petitioners argue, Patricia could have found it among Maurice's personal effects, and "facing her mortality," she could have mailed it to the trial court–anonymously so as to avoid the embarrassment of explaining the sworn allegation, in her petition for letters of administration, that Maurice had left no will.

¶ 71    In their briefs, respondents cite Patricia's petition for letters of administration and her inventory of Maurice's estate as evidence that the surviving duplicate original was not in Maurice's possession when he died. Those pleadings, however, were not evidence. Respondents never offered them as evidence at trial. If they had offered them as evidence, petitioners could have objected on the ground of hearsay.

¶ 72    In sum, petitioners had a limited burden under section 6-4(a) of the Probate Act (755 ILCS 5/6-4(a) (West 2010)). They did not have to prove where Maurice's will came from. They merely had to present a statement by two attesting witnesses, establishing the three elements in section 6-4(a). Petitioners presented such a statement, and therefore the trial court should have admitted the will to probate. Petitioners do not complain of this procedural irregularity, which ultimately makes no difference, anyway, because respondents acknowledged to the trial court that, under the law, they had the burden of proving the will was invalid by reason that Maurice had revoked it. To prove his revocation of the will, respondents had to prove that the surviving duplicate original was in the possession of someone other than Maurice at the time of his death, thereby excusing his noncompliance with section 4-7(a) as to that duplicate original. Respondents offered no evidence at all of the whereabouts of the surviving duplicate original will at the time of Maurice's death. Thus, it is "clearly apparent" that they failed to prove the revocation of the duplicate original will on file with the circuit clerk (assuming it is a duplicate original), and the trial court's judgment is against the manifest weight of the evidence. *DeLong*, 196 Ill. App. 3d at 979.

¶ 73                    III. CONCLUSION

¶ 74    For the foregoing reasons, we reverse the trial court's judgment and remand this case for further proceedings.

¶ 75    Reversed and remanded.